240 F.2d 37
 Jewell C. WOODS, Appellant,
v.
UNITED STATES of America, Appellee.
Marcellus L. WINSTON, Appellant,
v.
UNITED STATES of America, Appellee.
Barbara L. TOWLES, Appellant,
v.
UNITED STATES of America, Appellee.
Oliver G. HOLSEY, Appellant,
v.
UNITED STATES of America, Appellee.
Bossy GLOVER, Appellant,
v.
UNITED STATES of America, Appellee.
Wilbert W. GROSS, Appellant,
v.
UNITED STATES of America, Appellee.
James S. DAVIS, Appellant,
v.
UNITED STATES of America, Appellee.
James SHAY, Appellant,
v.
UNITED STATES of America, Appellee.
Christine CURTIS, Appellant,
v.
UNITED STATES of America, Appellee.
Burnie H. KING, Appellant,
v.
UNITED STATES of America, Appellee.
George BELL, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 12861-12871.
 United States Court of Appeals District of Columbia Circuit.
 Argued June 27, 1956.
 Decided December 31, 1956.
 Petition for Rehearing In Banc Denied February 8, 1957.
 
 Messrs. William B. Bryant and Henry L. Johnson, Jr., Washington, D. C., with whom Messrs. George E. C. Hayes, Saul G. Lichtenberg, DeLong Harris, and Curtis P. Mitchell, Washington, D. C., were on the brief, for appellants.
 Mr. John D. Lane, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Lewis Carroll and Frederick G. Smithson, Asst. U. S. Attys., were on the brief for appellee. Messrs. Leo A. Rover, U. S. Atty. at the time the record was filed, and E. Tillman Stirling, Asst. U. S. Atty., entered appearances for appellee.
 Before PRETTYMAN, BAZELON and BURGER, Circuit Judges.
 BURGER, Circuit Judge.
 
 
 1
 These eleven cases are before us on appeals from convictions for violations of the District of Columbia lottery laws and conspiracy to violate those laws. All appellants were convicted of operating a lottery, § 22-1501, D.C.Code 1951 and possessing numbers slips, § 22-1502, D.C.Code Supp.1955; five appellants were convicted of having conspired to operate a lottery and sell numbers, 18 U.S.C. § 371 (1952); four were also convicted of permitting the maintenance of premises for gambling, § 22-1505, D.C.Code Supp. 1955.
 
 
 2
 Appellants' main contentions are that: (1) items seized from searched premises should not have been admitted into evidence because the search warrants were issued without adequate probable cause; (2) the daytime search warrant for 1628 "O" Street, N. W., was illegally executed in that the return on the warrant indicates it was executed at 6:00 P.M.; (3) the search warrant for 2126 10th Street, N. W., was illegally executed because the officers entered the premises forcibly without the owner's consent and without giving notice of their authority and purpose; and (4) the five appellants convicted on the conspiracy count should have been acquitted as to that count.
 
 
 3
 The first two contentions were decided adversely to appellants by the District Court on motions to suppress evidence. The District Court's opinion, United States v. Bell, D.D.C.1955, 126 F.Supp. 612, carefully considered these two points and we believe reached the correct conclusion.
 
 
 4
 The third contention is that the search warrant for 2126 10th Street, N. W., was illegally executed because the officer, upon receiving no response to his knocking, forced the door open without first giving notice of his authority or purpose. Appellants rely on the provisions of 18 U.S.C. § 3109 (1952)[1] which provides that an officer may "break open" a door if he is refused admission after giving notice of his authority and purpose.
 
 
 5
 The record discloses that the officer in charge of the police party ordered a subordinate "to break the door open," that the subordinate pushed the door "and the door flew open."[2]
 
 
 6
 At this juncture we cannot determine on what basis the trial judge ruled adversely on the motion to suppress the evidence seized after and as a result of the entry here described. We are obliged to look at the record as showing an entry by force which under the statute cannot be made unless the officer first gives "notice of his authority and purpose." It is not disputed by the officers that as to the actions at 2126 10th Street, they failed to announce that they were police or that they were authorized to enter under a warrant. Having failed by their own admission, to comply with the command of the statute, we must hold the evidence was obtained as a result of the unlawful entry into 2126 10th Street. In Palmer v. King, 1914, 41 App.D.C. 419, 425-426, L.R.A.1916D, 278, this court said:
 
 
 7
 "* * * when an officer, in the execution of a writ, finds an outer door or window slightly ajar, but not sufficiently so to admit him, he may open the door or window, provided he does not find it obstructed, but if it is fastened or obstructed so as to require force to overcome the obstruction, he may not use such force, for such an entrance would constitute a breaking."
 
 
 8
 While the entry in the Palmer case dealt with civil process and relied on the common law rather than a statute such as we now have, the rationale of both is substantially the same. Justice Van Orsdel of this court stated the law to be: "He may enter either an open outer door or window, provided it can be accomplished without committing a breach of the peace; he may then, after request and refusal, break open any inner doors belonging to the defendant, in order to take the goods."[3] (Emphasis added.)
 
 
 9
 Five premises were raided. The 10th Street house was alleged to be a "money drop", not a principal place of business, and the evidence seized there was utterly insignificant compared with the masses of material seized at other places. Any analysis of the record shows this to be true. So, even if we regard this evidence obtained at 2126 10th Street as inadmissible, there remains the question of how this result affects the rights of the appellants. Elimination of the evidence seized at the 10th Street address leaves the Government's case unshaken, except with respect to appellant Shay, who was arrested at that address. With regard to the others, when all is said and done (using the language of the Supreme Court in the Kotteakos[4] case), we are convinced the error did not influence the jury or at most had but very slight effect. For this reason we affirm as to all appellants except Shay.
 
 
 10
 Of the fifteen people arrested in these raids only four were arrested at the 10th Street address, but one of these was dismissed, one was found not guilty, and one did not appeal; of those found at the 10th Street address only Shay was convicted and appealed. He was found guilty of operating a lottery and of possessing lottery slips. The slips which he was found guilty of possessing were seized at the 10th Street address. Therefore his conviction should be reversed, and he should be granted a new trial.[5]
 
 
 11
 Appellants' final contention is that they should have been acquitted as to the conspiracy count of the indictment on the ground that "the crime of conspiracy as defined in Title 18, § 371 U.S. Code, is either inapplicable to, merged in or so indistinguishable from [the] lottery statute as to prevent the conviction of appellants on both charges." Appellants argue that the conspiracy charge must involve proof of an element not necessary to proof of the substantive offenses and that there are no differences between the crime of conspiracy and the substantive offenses under the lottery laws.[6]
 
 
 12
 If this argument is based on the merger of the conspiracy with the substantive offense, it must be rejected. Whatever validity there may be in the proposition that "where * * * concert of action between two or more persons is logically necessary to [a crime's] completion a charge of conspiracy to commit it will not lie against such persons,"[7] this is not such a case. There is no logical necessity for a plurality of agents in order to violate the lottery laws.
 
 
 13
 Appellants, however, claim they are not simply making a merger argument but are offering a novel theory. They say that it is impossible to do anything which would constitute a conspiracy to violate the lottery laws without also actually violating those laws; therefore, the lottery laws and the conspiracy statute, when applied in this situation, punish exactly the same conduct, whereas it is necessary that there be an additional element for a conspiracy. This argument cannot be accepted.
 
 
 14
 Assuming that it would be impossible to violate 18 U.S.C. § 371 without also violating § 22-1501, D.C.Code,[8] the converse is not true — § 22-1501, D. C.Code, can be violated without violating 18 U.S.C. § 371, and the two statutes do not punish precisely the same offense. The additional element needed for the conspiracy is present, i. e., the concerted and associated effort of two or more persons to violate the lottery laws. This case is in fact an excellent example of a situation where the confederation of law violators can be far more dangerous than the single violator. The evidence showed there were 285 number writers who were not apprehended; the five dwellings involved were used as counting houses, places to deposit money, sell numbers and keep "rundown" tapes. Thus, the appellants concentrated records and equipment at various places in order to manage their extensive criminal enterprise with the least risk of detection. The conspiracy statute was designed to punish just such concerted action which makes crime "easier to perpetrate and harder to detect." Lisansky v. United States, 4 Cir., 1929, 31 F.2d 846, 849. The Supreme Court has said:
 
 
 15
 "* * * For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws, is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime. It involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices. And it is characterized by secrecy, rendering it difficult of detection, requiring more time for its discovery, and adding to the importance of punishing it when discovered." United States v. Rabinowich, 1915, 238 U.S. 78, 88, 35 S.Ct. 682, 685, 59 L.Ed. 1211.
 
 
 16
 For the reasons stated the judgment as to appellant Shay (No. 12,868) is reversed and remanded for a new trial not inconsistent with this opinion; judgments as to each appellant other than Shay are affirmed.
 
 
 17
 No. 12868 reversed.
 
 
 18
 Nos. 12861-7, 12869-71 affirmed.
 
 
 
 Notes:
 
 
 [1]
 18 U.S.C. § 3109 (1952):
 "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."
 
 
 [2]
 Transcript of Record, pp. 1369, 1587:
 "Q. All right, sir. Now what happened when you and Corporal Nielson arrived at these premises? A. Corporal Nielson knocked on the front door, one or two times. We did not receive any reply and I instructed Corporal Nielson to break the door open.
 "Q. How was it broken open, sir? A. He pushed the door with his hand, the back of his hand, and the door flew open.
 "Q. And you walked up to the door of 2126 10th Street, and what did you do, if anything, sir? A. I instructed Corporal Nielson to knock on the door.
 "Q. Did he? A. He did.
 "Q. What happened? A. No one answered.
 "Q. Is that all that was said between you and Corporal Nielson? A. I told him to break the door open.
 * * * * *
 "Q. And when there was no answer, you told him to break in the door? A. I did.
 "Q. And he broke in the door, is that correct? [Emphasis added.] A. He did." (Emphasis added.)
 
 
 [3]
 Palmer v. King, 1914, 41 App.D.C. 419, 425
 
 
 [4]
 Kotteakos v. United States, 1946, 328 U.S. 750, 754, 66 S.Ct. 1239, 90 L.Ed. 1557
 
 
 [5]
 The motions to suppress, as shown by the record before us, do not specifically include the evidence seized at the 10th Street place. But the District Court treated the motions which were filed as covering that evidence, and this court has done the same thing
 
 
 [6]
 § 22-1501, D.C.Code 1951 provides:
 "If any person shall within the District keep, set up, or promote, or be concerned as owner, agent, or clerk, or in any other manner, in managing, carrying on, promoting, or advertising, directly or indirectly, any policy lottery, policy shop, or any lottery, or shall sell or transfer any chance, right, or interest, tangible or intangible, in any policy lottery, or any lottery or shall sell or transfer any ticket, certificate, bill, token, or other device, purporting or intended to guarantee or assure to any person or entitle him to a a chance of drawing or obtaining a prize to be drawn in any lottery, or in a game or device commonly known as policy lottery or policy or shall, for himself or another person, sell or transfer, or have in his possession for the purpose of sale or transfer, a chance or ticket in or share of a ticket in any lottery or any such bill, certificate, token or other device, he shall be fined upon conviction of each said offense not more than $1,000 or be imprisoned not more than three years, or both."
 
 
 [7]
 Lisansky v. United States, 4 Cir., 1929, 31 F.2d 846, 848, 67 A.L.R. 67, citing such crimes as adultery, bigamy, incest, dueling
 
 
 [8]
 We do not agree that there could be no situation in which two or more persons might conspire to violate the lottery laws and commit an overt act toward that end without violating § 22-1501, D.C. Code 1951
 
 
 
 19
 BAZELON, Circuit Judge (concurring in part and dissenting in part).
 
 
 20
 I agree that the officers unlawfully broke into the premises at 2126 10th Street, N.W., and that the evidence uncovered by their search should have been excluded. I agree also that, since the evidence in question was instrumental in convicting appellant Shay, his conviction must be reversed. I do not agree, however, that the error of admitting the evidence was prejudicial only to Shay.
 
 
 21
 The unlawfully obtained evidence was used against all the appellants, and, if it may have helped to convict them, their convictions should be reversed. McDonald v. United States, 1948, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153; Kotteakos v. United States, 1946, 328 U.S. 750, 770-771, 66 S.Ct. 1239, 90 L.Ed. 1557; Anderson v. United States, 1943, 318 U. S. 350, 356-357, 63 S.Ct. 599, 87 L.Ed. 829; Nelson v. United States, 93 U.S. App.D.C. 14, 23, 208 F.2d 505, 514, certiorari denied 1953, 346 U.S. 827, 74 S. Ct. 48, 98 L.Ed. 352. As to each appellant, the evidence was prejudicial unless we are sure that the jury's "judgment was not substantially swayed by the error * * *." Kotteakos v. United States, 328 U.S. at page 765, 66 S.Ct. at page 1248. If the error, "within the range of a reasonable possibility, may have affected the verdict of a jury, appellant is not required to explore the minds of the jurors in an effort to prove that it did in fact influence their verdict." Little v. United States, 10 Cir., 1934, 73 F.2d 861, 866-867, 96 A.L.R. 889.
 
 
 22
 The testimony in this case is almost exclusively that of the police officers who investigated the case. Rather than undertake a detailed analysis of this 2,000 page transcript at this point,[1] I deem it sufficient to refer, as a fair abstract of the officers' testimony, to the nine-page affidavit they filed to support their requests for search warrants.
 
 
 23
 The skeletal facts are that the police, suspecting appellant Glover of being a numbers runner, placed him under surveillance and were thereby led to numerous other persons and places, including all of the appellants and the five raided premises. The report of a typical day's surveillance shows Bossy Glover making a round of calls on a regular circuit, coming out of each place with his "pockets bulging." Then, the affidavit continues:
 
 
 24
 "About 2:20 p. m. Glover came out of the rear of 41 L Street, N.W., and about three minutes later the 1941 Studebaker Sedan, K-5921, driven by James Davis, parked in the rear of 41 L Street, N.W. Davis got out of his car, walked over to Glover, and Glover handed him a large brown paper bag, believed to contain number slips, money, or other numbers paraphernalia. Davis then got back in his car and drove off. About 2:30 p. m., Officers Thomas and Jefferson went to the vicinity of Tenth and W Streets, N.W., and at about 2:35 p. m., this date, Officers Thomas and Jefferson observed Bossy Glover, who was known to be picking up numbers, park the Chevrolet Sedan, DC 3-3565 on the north side of the 1100 block of W Street, N.W., walk south through an alley and enter the rear of premises 2126 10th Street, N.W.
 
 
 25
 "About 2:45 p. m., Nov. 19, 1953, James Shay was seen to enter 2126 10th Street, N.W., with his overcoat pocket bulging, believed to be caused by number slips.
 
 
 26
 "About 2:45 p. m., Nov. 19, 1953, Bernie King was seen walking north in the 2100 block of 10th St., N.W. carrying a large brown paper bag, believed to have contained number slips or numbers paraphernalia, which he took into premises 2126 10th St., N.W.
 
 
 27
 "About 2:50 p. m., Nov. 19, 1953, Bossy Glover was seen to leave the rear of premises 2126 10th St., N. W., get into his car and drive off.
 
 
 28
 "About 3:13 p. m., November 19, 1953, Moultrie Wilson, a known numbers operator, was seen to drive north on 10th St., N.W., in a 1952 Ford Sedan, DCJ-707, park abreast in this block, and enter premises 2126 10th St., N.W., carrying a small brown paper bag, believed to contain number slips or other numbers paraphernalia. He remained in these premises about 2 minutes, returned to his car without the bag, and drove off.
 
 
 29
 "About 3:25 p. m., Nov. 19, 1953, George Bell, a suspected numbers writer, was seen to drive north on 10th St., N.W., make a `you' turn at W Street, N.W., and stop in front of 2126 10th St., N.W., at which time an unidentified colored man who was a passenger on the front seat of this car was seen to carry a brown paper bag, believed to contain number slips, into premises 2126 10th St., N.W. He remained inside about two minutes, came out minus the brown paper bag, got back into the car, and was driven out of the area."
 
 
 30
 Substantially the same confluence of suspects in and about 2126 10th Street, N. W., was observed from day to day.[2] The other important center of the operation (and of a higher echelon, since it was a "counting-house") was 1628 O Street, N.W., where Davis would go after meeting Glover. As the District Court said in denying appellants' motion to suppress evidence:
 
 
 31
 "After their customary meeting, Glover would enter 2126 10th Street, N.W., and Davis 1628 O Street, N. W., at about the same time other known and suspected numbers operators and certain unidentified persons would come together, raising a fair inference these premises were collection and counting centers where the numbers picked up that day were brought together, tabulated and checked against the winning number of the day, and the winnings allocated for distribution on the next day through the writers, collectors and runners. There was significance also in the time of day, between 2:30 and 3:45 p. m., when these persons would assemble, this being the time when operations at the headquarters of numbers opertions customarily commence."
 
 
 32
 The meetings between Davis and Glover were important, according to the Government, because they "linked the latter with the counting house at 1628 O Street, N.W., Glover never having been observed to have entree in the chain of addresses higher than 1026 [sic] 10th Street, N.W." Government's brief, p. 14. A number of other appellants as well appear to have had connection only with the 10th Street money-drop, but not with the O Street counting house.[3] It would seem, then, that the identification of the 10th Street premises as a money-drop was a crucial part of the prosecution's conspiracy case. The direct evidence upon which that identification was based was the illegally seized evidence we are discussing. It consisted of a paper bag containing $786.13 (including three one-dollar bills used by a police officer in buying a "number" from appellant Holsey on the day of the raid) and an adding machine tape; an adding machine; tapes showing computation of a winning number from horse race mutuels; number plays; a book of number slips; a pad of slips used for numbers; a racing sport sheet; two telephones; rolls of adding machine tape; and boxes of coin envelopes.
 
 
 33
 The chain with which the prosecution bound together these numerous appellants seems to have had two key links: the O Street counting house and the 10th Street money-drop. That the quarry would remain ensnared despite the broken 10th Street link is something we cannot determine and should not assume. I cannot say from this record that those of the appellants who, like Glover, were connected to the conspiracy through their contacts with the 10th Street premises would not, within reasonable possibility, have been acquitted but for the illegal evidence. Nor can I say with "fair assurance" that the other conspirators, who were connected to the conspiracy through O Street rather than 10th Street, would not have been acquitted if the 10th Street evidence were omitted. Conspiracies, including this one, are not proven by neatly compartmentalized evidence, but rather by an involved and interrelated mass of acts and statements by the various conspirators, the acts and statements of each member being admissible and binding against all the others. As Mr. Justice Jackson, concurring in Krulewitch v. United States, 1949, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790, said:
 
 
 34
 "As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended, or even known about, but which help to persuade the jury of existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed. The naive assumption that prejudicial effects can be overcome by instructions to the jury, cf. Blumenthal v. United States, 332 U.S. 539, 559 [68 S.Ct. 248, 92 L.Ed. 154], all practicing lawyers know to be unmitigated fiction. See Skidmore v. Baltimore & Ohio R. Co. [2 Cir.], 167 F.2d 54."
 
 
 35
 In the instant case, moreover, even the "unmitigated fiction" is absent, for all the evidence was admitted and considered against all the defendants for all purposes. When a prosecutor adds to an indictment a conspiracy count — "that darling of the modern prosecutor's nursery"[4] — his purpose is to take advantage of this very looseness of admissibility.[5] Among the "leverages obtained by the prosecution through proceeding as for conspiracy instead of as for the substantive offense is that it may get into evidence against one defendant acts or omissions which color the case against all." Mr. Justice Jackson, dissenting in Lutwak v. United States, 1953, 344 U.S. 604, 623, 73 S.Ct. 481, 492, 97 L.Ed. 593. See also 56 Col.L.Rev. 1112 (1956). In seeking that advantage, the prosecution assumes the risk that error may fatally weaken the entire interlocked structure.
 
 
 36
 In addition to conspiracy, some or all of the appellants were convicted of the substantive offenses of (1) operating a lottery, D.C.Code 1951, § 22-1501, which includes being "concerned * * *, in any * * * manner,[6] in * * * promoting, * * * directly or indirectly, any policy lottery, policy shop, or any lottery * * *"; (2) possession of numbers slips, D.C.Code 1951, Supp. III, § 22-1502, which applies to anyone who shall "have in his possession or under his control,[7] any record, notation, receipt, ticket, certificate, bill, slip, token, paper, or writing, current or not current, used or to be used in violating the provisions of sections 22-1501" et al.; and (3) permitting maintenance of gambling premises, D.C.Code 1951, Supp. III, § 22-1505, by which it is "unlawful for any person in the District of Columbia knowingly, as owner, lessee, agent, employee, operator, occupant or otherwise, to maintain or aid or permit the maintaining of any gambling premises."
 
 
 37
 In view of the breadth and generality of these statutes, there is an inextricable overlapping of proof between these substantive offenses and the conspiracy charge. Moreover, since the acts and statements of each conspirator are admissible against all, even on an indictment for a substantive offense, People v. Luciano, 1938, 277 N.Y. 348, 14 N.E.2d 433, 435-36, this overlapping must entail all or substantially all of the evidence in this record. "There is no reason to believe * * * [that the whole mass of evidence] which came before the jury as an organic tissue of proof can be severed and given distributive significance by holding that [it] had a major share in the conviction of some of the [appellants] and none at all as to the others." Anderson v. United States, 318 U.S. at page 357, 63 S.Ct. at page 602. We have no greater assurance of these substantive convictions than of the conspiracy convictions, had the jury not been given the illegal evidence.
 
 
 38
 There remain to be discussed only the numbers-selling convictions of appellants Glover and Holsey under D.C.Code § 22-1501. That section makes it unlawful, generally, to be concerned in any manner in promoting a lottery (as already noted), or, specifically, to sell or transfer, or possess for the purpose of sale or transfer, any lottery slip or ticket (which sale, transfer or possession are also components and evidence of the more general offense). Glover and Holsey were convicted of both general and specific violations of this section. It may be that convictions for the specific offenses of selling numbers could be reached by the jury on the evidence of the police officers who made the purchases, without any support from any of the more general evidence in the case, especially the evidence illegally seized in the 10th Street raid. Yet, quite apart from the direct effect upon the jury that the illegal evidence may have, it is also by no means clear that the jury would select these two underlings for punishment, if the operators of the counting house and the money-drop were acquitted, and even less clear that the trial judge would have given them as heavy a sentence as he did. We said in Nelson v. United States, 93 U.S.App.D.C. at 23, 208 F.2d at page 514: "Moreover, we think it `unjust and illogical to separate [these] cases' [citing United States v. Thomson, 7 Cir., 1940, 113 F.2d 643, 646] by reversing the judgment against the one charged with controlling the illegal enterprise and affirming the judgments against those who did his bidding." Since Shay's conviction is reversed, we should at least vacate Glover's and Holsey's sentences and remand their cases to the District Court for resentencing.
 
 
 39
 The majority affirms, as unaffected by the illegal evidence, all the convictions save that of Shay, who was arrested at the 10th Street address. Shay's conviction under D.C.Code § 22-1501 for operating a lottery they reverse, because the illegal evidence loomed larger against him than against any of the other appellants. In making that discrimination, the majority must have decided that the testimony of the police officers about Shay's activities (and about Glover's statements concerning those activities) did not sufficiently involve Shay as a person "concerned * * * in any * * * manner" with a lottery operation. With respect to the other appellants, presumably, my colleagues find sufficient untainted evidence to support the convictions. The close weighing of evidence which produces such differentiations is, I think, peculiarly a jury function. I have seldom seen a case where we could not point to evidence which might produce and support a conviction. But testing the prejudicial effect of error by combing the record in search of untainted support of the verdict is a substitution of our judgment for that of the jury. Where a jury has convicted on the basis of a certain quantum of evidence, I would only in the clearest of cases hold that it would, beyond any reasonable doubt, have convicted on less.
 
 
 
 Notes:
 
 
 [1]
 Cf. Nelson v. United States, 93 U.S.App. D.C. at page 23, 208 F.2d at page 514: "Since we cannot say from the record of more than two thousand pages that the jury would have convicted Nelson had all this evidence not been adduced, his conviction must be reversed and his case remanded for a new trial."
 
 
 [2]
 The District Court pointed out in its memorandum opinion of February 15, 1955, that the 10th Street premises had been identified in the police affidavit as a "headquarters for operation of a numbers lottery."
 
 
 [3]
 Appellants Davis, Winston, Towles, Gross, Curtis and King were connected up with the O Street address. So far as I have been able to discern, however, Woods, Holsey, Glover, Shay and Bell were connected to the conspiracy only through the 10th Street address
 
 
 [4]
 Judge Learned Hand in Harrison v. United States, 2 Cir., 1925, 7 F.2d 259, 263
 
 
 [5]
 An additional motive in many cases, including this one, is that "the punishment imposed for the conspiracy may be considerably greater than that imposed for commission of the substantive crime that was the object of the conspiracy." The Conspiracy Dilemma: Prosecution of Group Crime or Protection of Individual Defendants, 62 Harv.L.Rev. 276, 283 (1948). In the instant case, appellant King, for example, was sentenced to twenty months to five years on the conspiracy count, which is more than the maximum sentence on any of the other counts
 
 
 [6]
 The statute also provides that "possession of any copy or record of any such chance, right, or interest, or of any such ticket, certificate, bill, token, or other device shall be prima-facie evidence that the possessor" was in fact "concerned" in the offense
 
 
 [7]
 The statute says"knowingly had in his possession, * * *." But it also provides that mere possession of any of the enumerated items "shall be presumed to be knowing possession thereof."