Lewis L. **WAYNE**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 16709.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 27, 1962.

Decided April 4, 1963.

Petition for Rehearing En Banc Denied En Banc May 1, 1963.

Mr. Henry Lincoln Johnson, Jr., Washington, D. C., with whom Mr. Curtis P. Mitchell, Washington, D. C., was on the brief, for appellant.

Mr. Barry I. Fredericks, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., Frank Q. Nebeker, Asst. U. S. Atty., and Arthur J. McLaughlin, Asst. U. S. Atty., at the time the record was filed, were on the brief, for appellee. Messrs. Nathan J. Paulson and John R. Schmertz, Jr., Asst. U. S. Attys., at the time the record was filed, also entered appearances for appellee.

Before EDGERTON, WASHINGTON and BURGER, Circuit Judges.

BURGER, Circuit Judge.

Appellant was indicted on two counts, the first for an attempted abortion terminating in death, and the second for attempted abortion. Tried before a jury, he presented no evidence and was found guilty on only the second count. He was sentenced to imprisonment for a period of 2 to 6 years. The District Judge excluded as evidence certain medications claimed to be means of inducing the abortion under a ruling in a prior trial [1] that these items were "fruit" of an unlawful entry due to policy failure to announce the purpose of their entry. Our disposition will require a more complete discussion of this issue at a later point.

The following is a summary of undisputed facts: Jean Dickerson, the deceased victim of an attempted abortion, had absented herself from her regular employment as a school teacher and from her regular place of residence for a week due to an undisclosed "illness." The decedent and her sister called at appellant's residence for the purpose of making arrangements to have an abortion per-

[1]. Appellant was originally charged and tried for second degree murder and attempted abortion. A jury returned a verdict of guilty on both counts. The District Judge granted a new trial due to his own view that his instructions may have been erroneous, because of an inadvertent reference to manslaughter.

formed on the decedent, who was pregnant and unmarried. They returned the next day carrying $400 in currency. While the decedent's sister was present, appellant's co-defendant Portia Watson, who was granted a severance, made all physical arrangements for the abortion procedures at appellant's request. There was testimony that appellant instructed Portia Watson to "set him up" and that shortly thereafter she reported that she had done so. Appellant's license as a physician had previously been revoked.

The testimony showed that appellant carried a tube of some substance into the room where decedent had been taken and returned stating that she, the "patient," was having "good reactions." Hearing groans from the bedroom soon after this, appellant returned to the bedroom and later emerged saying "Oh my God, I believe she's dead." At this point the decedent's sister said she tried to leave the apartment but Portia Watson cried out "Catch that girl, she's trying to get out." The door was barred by two locks[2] and she was prevented from leaving. Later the decedent's sister was able to escape but was pursued by Portia Watson, who tore the woman's coat off in her effort to prevent flight. Evading pursuit, the sister contacted a friend who called the police.

Police testimony is that they reached the door of appellant's apartment in response to the emergency call, knocked and called out "Police" and requested entry.[3] The occupants made no response. Repeated knocking produced no response. After approximately 10 minutes, during which interval the decedent's sister returned to the scene, the caretaker was called on to produce master keys but it developed that double locks had been installed. The police then broke down the door and entered. Inside they found appellant, Portia Watson and one Henry Lincoln Johnson, Jr., appellant's attorney.

On the testimony offered in a pre-trial hearing, to which reference will be made later, the District Court granted the motion to suppress the medication and its container, and the cash found in the apartment. No appeal from that ruling was available to the government. Carroll v. United States, 354 U.S. 394, 77 S.Ct. 1332, 1 L.Ed.2d 1442 (1957). The record makes it clear that the pre-trial ruling was based on Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) and that the District Court considered the command of Title 18 U.S.C. § 3109 as absolute in all circumstances. The government argued that there were exceptions to literal compliance but did not elaborate on this claim.

At the second trial now under review, appellant objected to any evidence relating to the body of the deceased girl, claiming that the favorable ruling on the other physical evidence, i. e., the tube of medication and outer box, and impounded cash, also controlled as to all other evidence found on entering the room, i. e., the victim's body. The autopsy report and expert opinion as to cause of death, being dependent upon examination of the body, are challenged as "fruit" of an illegal entry. Essentially his claim is that the victim's body was subject to a motion to suppress. See Killough v. United States, D.C.Cir., 1962, 114 U.S.App.D.C. 305, 315 F.2d 241.

The District Judge at the second trial ruled that the testimony of the Deputy Coroner based on his autopsy was admissible. The expert testimony of the Deputy Coroner, Dr. Whelton, who performed the official autopsy required by law,[4] established (a) that the deceased was pregnant; (b) that foreign substances introduced into her body were the probable cause of death; and (c) that there were physical manifestations of an attempted abortion.

---

2. This may explain why the caretaker could not open the door from the outside at police request.

3. Compare the testimony of attorney Johnson at the pre-trial motion, discussed later in this opinion.

4. D.C.Code Ann. § 11–1203 (1961).

## Appellant's Contentions

Three claims are urged for reversal. Rather than attempting to restate or characterize them, we are reproducing them verbatim from appellant's brief:

"1. Is there sufficient evidence to survive a motion for acquittal upon a charge of attempted abortion where no evidence is adduced of the use of an abortifacient or instrument, an undertaking to perform an abortion, in the absence of medical or lay opinion that an abortion was attempted, upon medical opinion which is merely consistent with some but inconsistent with other evidence and permissible inferences of innocence

"2. Is the charge of a trial court erroneous so as to merit reversal where it reviews only the evidence and inferences consistent with guilt and totally ignores testimony and reasonably permissible inferences consistent with innocence, and is otherwise perceptibly adverse to a defendant who elects not to testify

"3. Is evidence secured from an autopsy performed by the coroner on a body the possession of which was obtained during the course of an illegal search and seizure constitutionally available after entry of an order of suppression and over objection."

### (1)

■ The motion for acquittal was properly denied. The evidence of the attempted abortion which resulted in the victim's death was, of course, not that of an eyewitness. On this record there could, obviously, have been only the appellant or his co-defendant Portia Watson who could qualify as eyewitnesses. They did not testify. The prosecution's evidence showed (a) the death of a pregnant, unmarried girl; (b) evidence she had carried $400 in cash to appellant's apartment; (c) testimony by the sister that as she fled the apartment she saw a large quantity of paper money on a table;[5] (d) medical evidence consistent with a recently attempted abortion; (e) opportunity of the appellant to commit the act, including direct personal contact with the decedent just before her death in a room which was under his control; (f) that appellant discussed the decedent's "good reactions" to some treatment or medication he had administered; (g) forcible efforts to prevent flight of decedent's sister when appellant said he "believed" the victim was dead. All this was uncontradicted. The evidence at the time of the motion for acquittal clearly presented a jury question. Thomas v. United States, 93 U.S.App.D.C. 392, 211 F.2d 45, cert. denied, 347 U.S. 969, 74 S.Ct. 780, 98 L.Ed. 1110 (1954); Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

### (2)

■ We have carefully examined the challenged portion of the charge containing discussion of the evidence in light of appellant's claim that it was "slanted" against him and prejudicial. However, any examination of this phase of the charge must take into account that *all* the evidence came from but one side, for the accused exercised his right to remain silent and tendered no other witnesses. To a degree, it was inherent in any discussion of the evidence that it would tend to be a discussion of the government's evidence. However, the jury was very carefully instructed on the burden of proof and its right to pass on credibility, which in these circumstances could apply only to prosecution witnesses. At the close the jury was again instructed that if its "recollection of the testimony in any respect differs from the summary" given by the court "it is your recollection that must govern." It can hardly be thought that the right of a trial judge to restate or summarize

5. Under the pre-trial suppression order this money, which was seized by police, was returned to Portia Watson who claimed it.

the evidence can be frustrated or circumscribed by a defendant's failure to offer any evidence. We find no merit in the contentions advanced on this claim.

(3)

(a) Appellant's third contention will be treated in two parts. The contention is that the entry of the police into his apartment, which had been found by a District Judge on a pre-trial motion to have been illegal, and the seizure of the body immediately following such illegal entry, precluded the introduction of the coroner's testimony about the condition of the body and the cause of death. The doctrine invoked is that commonly known as the "fruit of the poisonous tree." The government challenges the finding that the entry was illegal and argues further that, even if it was, it did not preclude the coroner from testifying.

█ Without now reaching the legality of the entry, we agree with the government that, in the circumstances of this case, the testimony objected to could not be considered as the "fruit of the poisonous tree." The Supreme Court has recently had occasion to discuss and clarify this difficult doctrine. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). It stated that the exclusionary rule has no application when the government obtains evidence "from an independent source." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The Court added that the question to be asked in applying the doctrine is " 'whether, *granting establishment of the primary illegality*, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." Wong Sun v. United States, supra, 371 U.S. at 488, 83 S.Ct. at 417. (Emphasis added.)

█ It appears to us that the standards set forth in Wong Sun call for admission of the coroner's testimony. It is undisputed that the deceased's sister had told the police, prior to their entry into appellant's apartment, that her sister was there. No one seeking entry "knew" as a fact that she was dead and no one had a right to assume it was a "body," rather than a dying or unconscious person, as the police thought. Accordingly, it is clear that this information came from an independent source, and it cannot reasonably be said that the evidence embodied in the coroner's testimony was acquired "by exploitation of * * * [the] illegality," see Maguire, supra, or that it can be regarded as "gained by the Government's own wrong," Silverthorne, supra, 251 U.S. at 392, 40 S.Ct. at 183. It was inevitable that, even had the police not entered appellant's apartment at the time and in the manner they did, the coroner would sooner or later have been advised by the police of the information reported by the sister,[6] would have obtained the body, and would have conducted the post mortem examination prescribed by law. See D.C.Code Ann. § 11–1203 (1961). Thus, the necessary causal relation between the illegal activity and the evidence sought to be excluded is lacking in this case.

Judge WASHINGTON considers that the discussion in the preceding pages amply justifies the admission of the coroner's testimony, and that it is not necessary for us to pass upon the legality of the police entry, the reviewability of the pre-trial order, or the need (or not) to remand the case for further hearings on the circumstances of the entry. Accordingly, the discussion which follows reflects my own views. Judge WASHINGTON concurs in this opinion up to this point, and concurs in the affirmance of the conviction.

(b) There is an alternative basis on which the action of the District Court

---

6. Rules and Regulations of the Metropolitan Police, Chapter II, Section 55, p. 33, Chapter XXIV, Section 12, p. 104a (eff. Nov. 1948).

admitting the testimony of the Deputy Coroner can, in my view, be sustained. That alternative basis is to review, now, the validity of the pre-trial order ruling that the forcible entry into the apartment was illegal. The facts relating to the entry have been described in part under the statement of the case. For present purposes the testimony of Henry Lincoln Johnson, Jr., at the pre-trial hearing becomes pertinent. Before considering that testimony it should be noted that the pre-trial ruling was not based on an evaluation of credibility of the officers who testified that they announced "Police" but not their purpose for seeking entry. Rather the pre-trial judge assumed that their identity had been announced but that the admitted failure to announce *purpose* rendered their forcible entry a violation of 18 U.S.C. § 3109.

The comments of the pre-trial judge reveal that he saw no exceptions to the holding of Miller v. United States, supra, that an entry for search without a warrant must be carried out strictly in compliance with § 3109 and that no exceptions could be made. The prosecution suggested to the pre-trial judge that exceptional circumstances excused literal compliance with § 3109 but failed to develop this argument and did not point to Supreme Court utterances which tended to support the government's position.

The requirement of notice of authority and purpose for entry is not new. The provisions of § 3109 have their roots, as Justice Brennan pointed out in the Miller opinion, in a holding more than 350 years old.[7] Commenting on the command of Semayne's Case that before an officer breaks in he "ought to signify the cause of his coming, and to make request to open doors * * *." Mr. Justice Brennan continued:

"The requirement stated in Semayne's Case still obtains. It is reflected in 18 U.S.C. § 3109, in the statutes of a large number of States, and in the American Law Institute's proposed Code of Criminal Procedure, § 28. It applies, as the Government here concedes, whether the arrest is to be made by virtue of a warrant, or when officers are authorized to make an arrest for a felony without a warrant. There are some state decisions holding that justification for noncompliance exists in exigent circumstances, as, for example, when the officers may in good faith believe that they or someone within are in peril of bodily harm, Read v. Case, 4 Conn. 166, or that the person to be arrested is fleeing or attempting to destroy evidence. People v. Maddox, 46 Cal.2d 301, 294 P.2d 6. (Footnotes omitted.)

*    *    *    *    *    *

* * * It may be that, without an express announcement of purpose, the facts known to officers would justify them in being virtually certain that the petitioner already knows their purpose so that an announcement would be a useless gesture. Cf. People v. Martin, 45 Cal.2d 755, 290 P.2d 855; Wilgus, Arrest Without a Warrant, 22 Mich. L.Rev. 541, 798, 802 (1924). * * * (Footnotes omitted.)" Miller v. United States, 357 U.S. at 308–309, 310, 78 S.Ct. at 1195–1196.

In the Miller opinion the Court was careful to point out that "The Government makes no claim here of the existence of circumstances excusing compliance." Unless § 3109 is to be applied to the point of utter absurdity the courts are warranted, by what the Supreme Court has said, in assuming that circumstances may arise where because of an urgent need or because announcement would be a "useless gesture," literal compliance with § 3109 is not always required. To say this is to do no more than repeat what is axiomatic—that the law does not require "useless gestures."

7. Semayne's Case, 50 Co.Rep. 91a, 11 E.R.C. 629, 77 Eng.Repr. 194.

Against this background I turn to a more detailed examination of the facts leading up to the entry, the facts known to police, the facts known to the occupants all of which are urged by the government as showing an exigent situation excusing literal compliance with § 3109.

Henry Lincoln Johnson, Jr., the attorney who was found in the apartment, testified on the pre-trial motion that he was called to the apartment after the deceased girl's sister had fled; that he saw appellant "in a state of collapse" and a woman lying on a bed. While there and before police arrived Johnson said there was conversation about calling a doctor or an undertaker, thus indicating that even while police were knocking at the door there was no certainty the woman was dead. He testified he was informed either by appellant or by Portia Watson, that "the latter had tried to stop the girl [sister of the victim] from leaving but that she broke away and ran out in an excited condition from the place" 15 or 20 minutes before he arrived. He conceded the girl had left "against Portia Watson's will." Johnson testified he heard voices and "some commotion" outside the door and knocking at the door; that he told Portia Watson "if the police came to let them in if they announced who they were and what they wanted." He also testified "the knocking increased in tempo and then the door broke on in." Johnson said he heard no one announce that police were at the door. He testified he was in the apartment approximately 12 minutes before police arrived. He said he did not suspect that the people outside the door might be police and "I didn't think there was any occasion for the police. * * * I didn't have the slightest idea * * * that the police had any connection with it." However he conceded that he passed a police cruiser standing in the driveway as he entered the apartment "which I didn't connect with anything." He also said he heard someone trying to open the door with a key but did not ask who was trying to get in or who was knocking. Johnson admitted he knew appellant prior to this event and had defended him in other abortion cases. He said he thought that the knocking continued for about 3½ minutes.

A police officer testified that the police cruiser received a radio message that there was "an unconscious person in apartment 614 of the Rhode Island Avenue Plaza," that they responded at once and found that the apartment number was wrong and no unconscious person was in 614; that they were directed to 618, as an apartment occupied by a doctor. There they said they knocked repeatedly and identified themselves as police officers in a "loud voice." Other officers from a second police cruiser joined them. Testimony of officers was that they did not break in until about 10 minutes after knocking and calling "Police."

The government is free, of course, to attack the pre-trial ruling that the forcible entry by police was a violation of 18 U.S.C. § 3109 since this is the first opportunity it has had to raise the point. Carroll v. United States, supra. The government's contentions are (a) that an exigency existed justifying entry without a warrant because the officers had only a report of an "unconscious woman" and (b) that a statement of purpose was not imperative because under all the circumstances it would have been a "useless gesture." Miller v. United States, supra, 357 U.S. at 308–310, 78 S.Ct. at 1195–1196; People v. Martin, 45 Cal.2d 755, 290 P.2d 855. See Wilgus, Arrest Without a Warrant, 22 Mich.L. Rev. 541, 798, 802 (1924).

The appraisal of exigent circumstances surrounding execution of search warrants or forcible entries without a search warrant presents difficult and delicate problems. These cases do not arise in the calm which pervades a courtroom or library. They are rarely if ever seen by courts except in cases where criminal activity has been uncovered by the challenged police actions. They are not matters resolved by meditation and reflec-

tion of the participants. The events are likely to be emotion-charged, filled with tension, and frequently attended by grave risks. Neither the Constitution, statutes or judicial decisions have made the home inviolable in an absolute sense. Collectively they have surrounded the home with great protection but protection which is qualified by the needs of ordered liberty in a civilized society.

Breaking into a home by force is not illegal if it is reasonable in the circumstances. The standards controlling a breaking in without a warrant are those prescribed in § 3109. Miller v. United States, supra. But a warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of "dead bodies," the police may find the "bodies" to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response. A myriad of circumstances could fall within the terms "exigent circumstances" referred to in Miller v. United States, supra, e. g., smoke coming out a window or under a door, the sound of gunfire in a house, threats from the inside to shoot through the door at police, reasonable grounds to believe an injured or seriously ill person is being held within.

Section 3109 enters this case because the appellant successfully moved in the District Court to suppress evidence. But compliance with § 3109 is not the only source of authority by which police could lawfully enter private quarters. As I have already suggested, evidence of a fire or of escaping gas would warrant public authority to enter by any available means if there was not a prompt response to knocking. That such an entry would be an intrusion is undoubted but here we reach the balancing of interests and needs. When policemen, firemen or other public officers are confronted with evidence which would lead a prudent and reasonable official to see a need to act to protect life or property, they are authorized to act on that information, even if ultimately found erroneous. We need not resort to § 3109 as such to justify entry in those circumstances.

Here two streams of potential authority for entry exist and at a point they merge. When the police first arrived on the scene they had only the report of an "unconscious woman." At a point after the victim's sister arrived there may well have developed grounds for entry other than a civil emergency, *i. e.*, reasonable grounds to believe a criminal act had been committed in the apartment. The record is confusing partly because a situation of this kind is filled with confusion and ambiguity. If we could expect that patrolmen from police cruisers would be able to pinpoint the instant when they stopped treating this as a civil emergency, if they did, and began thinking of it in criminal terms, we would be asking them to resolve, under pressure and in minutes, a most subtle and delicate legal and constitutional problem on which, as we now demonstrate, judges cannot agree after months of study and deliberation.

Even if we assume that police entry was pursuant to a civil emergency, can it be thought that what they find inside is to be suppressed? Are we to say that police or firemen may enter to apply a tourniquet or resuscitator, for example, but may not act on evidence of a crime which they then observe incidentally without any search?

In the instant case police received a report which, if true, no reasonable mind could view as other than one indicating a grave emergency, for the cruising po-

lice were instructed to check on a report of an "unconscious woman" and could not assume the woman was dead. Even the "disbarred" doctor had not said the victim was in fact dead, but that he *thought* she was dead. Police response was indeed swift and were they to have paused for a warrant with the risk that the "unconscious woman" might die while papers were being drawn they could surely merit censure.

Once at the door of a place to be entered for arrest or search the law indeed commands that police state their identity and purpose. Here the record shows, beyond dispute, that police were pounding on the door demanding entry with what appellant's own lawyer in the apartment called "increasing tempo." It is beyond question that the occupant of a house has a right to know why the police seek entry. But the law does not require futile, useless things to be done. If stating the purpose of the police to the occupant would have been a "useless gesture"[8] the law will make an obviously common sense exception and dispense with telling an occupant what he already knows. We must therefore ask whether in this case a statement by police that "We are checking a report of a dead, dying or unconscious woman" would have been a "useless gesture" or whether on the other hand that was reasonably called for to allow the appellant an opportunity to admit the police. In short, the question is whether the occupants knew the purpose of police presence and their reason for desiring entry.

To answer this we need to look to the setting and the circumstances of the moment. In the room was a "disbarred" doctor who had performed or attempted to perform an abortion on a patient who he then thought might be dead. With him was the woman who aided him in the criminal acts performed. By an unusual sequence of events the appellant, although described as in a state of collapse by his attorney, had arranged to have that attorney present. We can do no more than speculate as to what went on in the mind of that attorney as he heard a pounding at the door within minutes after he had seen a police cruiser standing at the *doorway* as he entered the building. There is no adequate explanation why an officer of the courts would fail to admit the police, since the purpose of their prolonged knocking with "increasing tempo," to use his own words, surely could not have eluded a lawyer experienced in such matters.[9] Whether he advised his client to refuse entry, thus laying a foundation for the arguments which later he was personally to urge upon us, we cannot know. But analysis of these facts can lead to no conclusions except: (a) appellant and other occupants knew the purpose as well as identity of those demanding entry; (b) all occupants had more than adequate opportunity to *ask* the police purpose if indeed they did not know it; (c) with a dead or dying woman in an adjacent room, appellant, as a former physician, must be presumed to have known it was his affirmative duty to report a death to police or seek emergency aid if there was doubt as to death; (d) with an attorney present the latter at least must have known the police purpose.

I can see no escape from the logic of the Government's argument that the police had a right—if not a duty—to assume that, absent a reply to prolonged knocking, (a) that the occupants may have fled leaving an unconscious, dying, or dead person alone or (b) that the oc-

---

8. Miller v. United States, 357 U.S. 301, 309–310, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

9. The presence of a lawyer in the apartment is relevant to an evaluation of the need to inform occupants of police purpose, especially since the lawyer admitted that when he entered the building the police cruiser had already arrived. Presumably the officers may then have been engaged in the fruitless search for the "unconscious woman" at the wrong apartment. Otherwise the conduct of the attorney is not now in question. Appropriate inquiry, if that is indicated, may be made by the District Court and by this court after this litigation has been terminated.

cupants were concealing a dead body or (c) refusing to permit access to an unconscious person whose life might be endangered by delay. It would be extraordinarily difficult to conjure a more exigent situation than this, or one in which further unilateral conversation through the door would be more absurd and more plainly a "useless gesture."

I do not think we should adopt the "sporting contest" concept of criminal justice in which form governs substance. Form is of genuine importance in the law, for the law is form in a sense, but there are limits beyond which I will not go. I reject the idea that society can be frustrated and denied reasonable protection by mechanical adherence to formalism. Police should not be required to lay siege to an apartment to await a search warrant while a life may be at stake. For my part I would not gamble the possibility of saving the "unconscious woman" on the chance that the drunken ex-doctor and the hysterical sister had made an accurate diagnosis of death. Human life is more important than the statement of the police purpose to people who could not rationally have had any doubt about that purpose.

My view of the case affords this alternative ground to affirm the action of the District Court in admitting the Deputy Coroner's testimony as to the autopsy performed on the victim and as to the cause of death, apart from the grounds discussed under 3(a) above.

Affirmed.

EDGERTON, Circuit Judge (dissenting).

It is hard for me to disregard the conduct and consider the rights of an un-

licensed [1] drunken doctor who seems to have bungled his work and killed his patient.

Since Judge Burger thinks the police entered Wayne's apartment legally and I think they entered illegally, while Judge Washington does not reach this question, it is not decided. Judge Washington and Judge Burger think the coroner's testimony was rightly admitted and therefore affirm the conviction. I disagree.

Before a previous trial, Judge Pine held a hearing on a motion to suppress evidence. Officer Dixon testified that his police cruiser got a radio call at 6:50 p. m. "for an unconscious person in apartment 614 of the Rhode Island Avenue Plaza." At the apartment house they learned that appellant's number was 618. Detective Martone called No. 12 Precinct to check on the number. He "learned a phone call had been placed to the precinct by a woman who said her sister was lying dead in * * * Doctor Wayne's apartment * * *." The police knocked repeatedly at his apartment, got no answer, announced "police", and said "open the door, this is the police", in a loud voice. They knocked for several minutes.

Joan Dickerson joined them in the corridor outside the apartment. According to the police, she told them she had gone to Wayne's apartment with her sister Jean, that Jean said she was going there for an abortion, that Jean went into a bedroom with Wayne, and that when Wayne came out he said "Oh, my God, she is dead." [2] Officer Martone knocked again very loudly and demanded entrance, saying "police". The police did not announce their purpose. By the time Martone and Dixon "forced the door" and entered, five policemen, an under-

---

1. Wayne's license had been revoked under D.C.Code § 2–123 as the result of a prior abortion.

2. Transcript, p. 36. At the trial, Joan herself testified that when Wayne came out of the bedroom he "said she was dead"; that he said "Oh, my God, I believe she's dead"; and that he said, "Oh, my God, she's dead". Joan gave each of these versions. She also testi-

fied that she went into the bedroom and saw her sister lying on the bed, dead; that she walked to her aunt's home five blocks away; and that a cousin telephoned the police from a neighbor's house. This testimony has some tendency to confirm, though only indirectly, the testimony of Joan and the police as to what the police knew when they broke in.

taker, and others had gathered in the corridor.

At the end of the hearing before Judge Pine he found that "the entry into [defendant's] premises by law enforcement officers, and the subsequent search thereof and the seizure made therein were illegal and in violation of the defendant's statutory and constitutional rights". He ordered "that all evidence seized, secured and obtained as a result of the unlawful entry be and the same is hereby suppressed as evidence".[3] He made it clear that his order was based on the failure of the police to announce their purpose.

When the present trial began, appellant's counsel informed the court of Judge Pine's ruling. The prosecutor told the court that "as a result of entering the apartment they found this body in there, the deceased. She was taken to the Morgue, and of course * * * the doctor at the Morgue performed an autopsy * * *." The trial judge announced and the prosecutor conceded that Judge Pine's order "is not limited to the original indictment, it applies to any proceedings in this case."

I think Judge Pine was right.

"The rule seems to require notice in the form of an express announcement by the officers of their purpose for demanding admission. The burden of making an express announcement is certainly slight. A few more words by the officers would have satisfied the requirement in this case." Miller v. United States, 357 U.S. 301, 309–310, 78 S.Ct. 1190, 1196, 2 L.Ed. 1332 (1958). The Supreme Court suggested but did not say that an express announcement of purpose may be unnecessary if "the facts known to of-ficers would justify them in being virtually certain that the petitioner already knows their purpose so that an announcement would be a useless gesture." Ibid., at 310, 78 S.Ct. at 1196. It appears to me that the facts known to the officers in the present case could not justify that certainty.[4] It now appears that the purpose of the officers was to remove a corpse. But it does not appear that anything they knew made it unlikely that the occupants, one of whom was Wayne, thought they had come to arrest him. The difference is not technical but substantial. It is quite possible that Wayne was more concerned for his own immediate freedom than with the time and manner in which the police were to get the corpse. It may well be that the occupants would have opened the door if they had known the actual purpose of the police.[5]

The government argues that the police reasonably believed there was no living person in the apartment. Even if they had been right in thinking so, it would not have excused their unannounced forcible entry. "A man's home is just as private when he is not there as when he is * * * It would be a far departure from fundamentals * * * to hold that a man has a protected right of privacy in his home and its belongings so long as he is on the premises, but none when he is not there. Not only does such a proposition appear untenable on its face but the cases so indicate." Morrison v. United States, 104 U.S.App.D.C. 352, 356–357, 262 F.2d 449, 454–5 (1958). Mere failure to receive a response does not excuse omitting the announcement. Woods v. United States, 99 U.S.App.D.C. 351, 240 F.2d 37 (1957), cert. denied, 353 U.S. 941, 77 S.Ct. 815, 1 L.Ed.2d 760, and *sub nom.* Curtis v. United

---

3. Crim. No. 594–60; May 15, 1961.

4. Cf. United States v. Barrow, 212 F.Supp. 837 (E.D.Pa.1962).

5. If the police know that the occupants are aware the police want to get in, this does not excuse failure to announce their purpose. Miller v. United States, supra; Accarino v. United States, 85 U.S.App.

D.C. 394, 179 F.2d 456 (1949); Masiello v. United States, 113 U.S.App.D.C. 32, 33–34, 304 F.2d 399, 400–401 (1962); Hair v. United States, 110 U.S.App.D.C. 153, 155, 289 F.2d 894, 896 (1961).

I know of no case which requires the occupants to *ask* the police purpose, as Judge Burger suggests they should have done.

States, 354 U.S. 926, 77 S.Ct. 1385, 1 L. Ed.2d 1438 (1957).

It is said that there was an emergency which exempted the case from the requirement that the police announce their purpose. I think this erroneous for two distinct reasons. (1) Although the police may have thought when they got the first telephone call that a living person in need of rescue was in the apartment, they knew better before they broke in. Before they broke in, a woman had telephoned them that her sister was "lying dead" in the apartment, and Joan herself had joined them in the corridor and told them face to face that Wayne had said "Oh, my God, she is dead." "[T]he burden is on those seeking the exemption to show the need for it, McDonald v. United States, 335 U.S. 451, 456 [69 S.Ct. 191, 93 L.Ed. 153] (1948)." United States v. Jeffers, 342 U.S. 48, 51, 72 S. Ct. 93, 95, 96 L.Ed. 59 (1951). Instead of showing the need for it the government has shown, though not conceded, that there was no need for it. There is no denial in the record, and the government even emphasizes, that when the police broke in they knew they would find Jean's dead body. The record does not show, or even suggest, that some independent kind of emergency called for immediate action. (2) An emergency can justify in law no more than it requires in fact. "[R]easonableness without a warrant is adjudged solely by the extremity of the circumstances of the moment and not by any general characteristic of the officer or his mission." District of Columbia v. Little, 85 U.S.App.D.C. 242, 245, 178 F.2d 13, 16, 13 A.L.R.2d 954 (1949), affirmed, 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950). An emergency sufficient to justify police in breaking in after announcing their purpose may not be sufficient to justify them in breaking in without making the announcement. The police could have announced their purpose in an instant. Announcement would have caused no delay. It would not have given the occupants an opportunity to destroy the body or other evidence or to escape. That there was, on the facts known to the police, no need for precipitate action is clear from the fact that the police took no such action. They were in the corridor many minutes before they broke in. As in the recent Wong Sun case, "no extraordinary circumstances * * * excused the officer's failure truthfully to state his mission before he broke in." Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963).

In summary: even if the officers had announced their purpose, their breaking in would have been illegal because there was no emergency, and even if there had been an emergency their breaking in would have been illegal because they did not announce their purpose.

We need not consider whether the police could have got either a warrant or a subpoena authorizing them to enter the apartment and take the body. If they could, this would not excuse their forcible entry without either. Johnson v. United States, 333 U.S. 10, 13–14, 68 S. Ct. 367, 92 L.Ed. 436 (1948). If they could not, their violation of appellant's privacy was all the more arbitrary. Their forcible entry would have been illegal even if there had not been so many of them that some could have gone to seek authority while others guarded the apartment. That there were so many makes the illegality of their breaking in particularly clear.

It is immaterial that Wayne was not entitled to possession of the body and that the coroner was entitled to possession of it in order to perform an autopsy. D.C.Code § 11–1203, which requires the coroner to hold inquests, does not deal with admission or exclusion of evidence. F.R.Crim.P. 41(e) provides that even if illegally seized evidence is "subject to lawful detention" it is not "admissible in evidence at any hearing or trial." In United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), the defendant was not entitled to possession of illegally seized narcotics, but he was entitled to have them suppressed as evidence.

Since the body, which made it possible for the coroner to testify, was illegally obtained, I think his testimony should have been excluded.[6] That the police learned legally from Joan that Jean was dead is immaterial because this knowledge did not, without the aid of the subsequent illegal entry, enable the coroner to testify. The "independent source" principle is simply that evidence obtained *without use of illegal means* is not excluded on the ground that the same evidence has also been obtained by use of illegal means. Since the body, and consequently the coroner's testimony, were not obtained without use of illegal means, the principle has no application here.

The majority of the court take the position that legal acquisition of information *leading to* an illegal entry makes evidence *resulting from* the illegal entry admissible, if by using the legally acquired information in a *different* way the government *could have* got the resulting evidence legally. The court says: "even had the police not entered appellant's apartment at the time and in the manner they did, the coroner would sooner or later have been advised by the police of the information reported by the sister, would have obtained the body, and would have conducted the examination prescribed by law. See D.C.Code Ann. § 11–1203 (1961). Thus, the necessary causal relation between the illegal activity and the evidence sought to be excluded is lacking in this case." This amounts to saying that because the government had obtained from Joan enough information to get a warrant or a subpoena there was no need to get one; that evidence obtained by breaking in without a warrant is admissible if the same evidence could have been obtained legally by getting a warrant. The Supreme Court has held the contrary many times. "Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause." Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925). Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932) ; Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). "Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the [Fourth] Amendment to a nullity and leave the people's homes secure only in the discretion of police officers." Johnson v. United States, supra, 333 U.S. at 14, 68 S.Ct. at 369. As Judge Clark recently said for the Second Circuit, "a showing that the government had sufficient independent information available so that in the normal course of events it might have discovered the questioned evidence without an illegal search cannot excuse the illegality or cure tainted matter. * * * The test must be one of actualities, not possibilities." United States v. Paroutian, 2 Cir., 299 F.2d 486, 489 (1962). I know of no decision to the contrary.

"In order to make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person, Boyd v. United States, 116 U.S. 616 [6 S.Ct. 524, 29 L.Ed. 746], [the Supreme] Court held nearly half a century ago that evidence seized during an unlawful search could not constitute proof against the victim of the search. Weeks v. United States, 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed. 652]. The exclusionary prohibition extends as well to the indirect as the direct products of such invasions. Silverthorne Lumber Co. v. United States, 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319]. Mr. Justice Holmes, speaking for the Court in that case * * expressed succinctly the policy of the broad exclusionary rule: 'The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be

6. Cf. the concurring opinion of Circuit Judge Wright in Killough v. United States, 114 U.S.App.D.C. 305, 315 F.2d 241, 252 (1962).

used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.' 251 U.S., at 392 [40 S.Ct. at 183]." Wong Sun v. United States, 371 U.S. at 484–485, 83 S.Ct. at 416.

Though the coroner's testimony resulted indirectly from information, legally obtained, that Jean was dead, it resulted more directly from knowledge obtained through subsequent illegal action of the police. Courts have sometimes held that a supervening criminal cause insulates a previous non-criminal cause from responsibility for consequences. I doubt if it has ever been held before that a previous non-criminal cause insulates a supervening criminal cause from responsibility for consequences.