**UNITED STATES of America, Plaintiff,**

v.

**Douglas WILLIAMS, Defendant.**

**No. 01–CR–121A.**

United States District Court, W.D. New York.

July 29, 2002.

---

Joel L. Violanti, U.S. Attorney's Office, Buffalo, NY, for U.S.

Kimberly A. Schechter, Buffalo, NY, for Defendant.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge H. Kenneth Schroeder, Jr. pursuant to 28 U.S.C. § 636(b)(1)(A). On August 6, 2001, defendant filed a motion to suppress evidence seized on April 24, 2001, from his apartment at 68 Best Street, Buffalo, New York, and a 1978 Suburban vehicle parked in the driveway of 68 Best Street. On May 16, 2002, Magistrate Judge Schroeder filed a Report and Recommendation, rec-ommending that defendant's motion to suppress be denied.

On June 3, 2002, defendant filed objections to the Magistrate Judge's recommendation that his motion to suppress evidence seized from his apartment at 68 Best Street be denied.[1] The government filed a response to the objections on June 28, 2002, and defendant filed a reply thereto. Oral argument on the objections was held on July 11, 2002.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Schroeder's Report and Recommendation, defendant's motion to suppress evidence seized from his apartment at 68 Best Street, Buffalo, New York and from the 1978 Suburban vehicle parked in the driveway of 68 Best Street on April 24, 2001 is denied in all respects. The parties shall appear before the Court on Wednesday, July 31, 2002 at 9:00 a.m. for a status conference and/or a meeting to set trial date.

IT IS SO ORDERED.

## *REPORT, RECOMMENDATION AND ORDER*

SCHROEDER, United States Magistrate Judge.

Pursuant to 28 U.S.C. § 636(b)(1), all pretrial matters in this case were referred

---

1. Defendant did not object to the Magistrate Judge's recommendation that his motion to suppress evidence seized from the Suburban vehicle also be denied.

to the undersigned by the Hon. Richard J. Arcara.

## PRELIMINARY STATEMENT

The defendant has been charged in a one count indictment of being a felon in possession of two firearms, to wit, a Davis Industries .380 caliber pistol and a Rossi .357 caliber revolver in violation of 18 U.S.C. §§ 922(g)(I) and 924(a)(2).

The defendant has filed a motion to suppress certain evidence that was seized from his residence at 68 Best Street, Buffalo, New York on April 24, 2001 consisting of the Davis Industries .380 caliber pistol and the Rossi .357 caliber revolver and alleged crack cocaine and documents and evidence consisting of spent shell casings which were seized from a 1978 Suburban truck while it was unoccupied and parked in the driveway of 68 Best Street, Buffalo, New York on April 24, 2002.[1]

A preliminary examination on the original Criminal Complaint filed against the defendant herein was held on July 2, 2001 at which time Detective Noreen Walsh of the Buffalo Police Department and Officer Dennis Gilbert of the Buffalo Municipal Housing Authority testified for purposes of establishing probable cause for the charges made against the defendant. Since pertinent testimony relating to the issues raised by the defendant's suppression motion was given at this hearing, I will utilize such testimony as I deem appropriate for purposes of resolving the issues raised in the suppression motion.[2]

A formal suppression hearing was held on September 18, 2001 at which time Detective Noreen Walsh and Officer Gregory McCarthy of the Buffalo Municipal Housing Authority testified. A number of exhibits were received in evidence at this hearing and will be referenced by the exhibit designation given at the hearing. Thereafter, a transcript of this proceeding was filed on October 18, 2001[3], and the matter was taken under advisement at that time.

## FACTS

At approximately 9:58 a.m. on the morning of April 24, 2001, a "drive–by shooting" occurred on Dishler Street in the City of Buffalo, New York which shooting was reported by Ernest Jackson. At the time of the report, descriptions of the alleged vehicle involved and the occupants in the vehicle were supplied to the Buffalo Police by witnesses to the event. (SH Transcript, p. 30). As part of the investigation of this shooting, numerous witnesses and suspects were brought to the C District police station located at 693 East Ferry Street in the City of Buffalo by members of the Career Criminal Task Force ("CCTF"). Included in this group was the defendant, Douglas Williams. Thereafter, Officers Dennis Gilbert and Gregory McCarthy, working as a team and as members of the CCTF investigating this shooting, received information from a confidential source which led them to 68 Best Street in the City of Buffalo. They arrived at this location at approximately 11:00 a.m. on April 24, 2001. (SH Transcript, p. 108). When they arrived at this location, they observed a 1978 Suburban vehicle parked in the driveway of 68 Best Street which matched the description of

---

1.  Originally, the defendant also moved to suppress certain statements allegedly made by him to the police, but that issue is resolved by the government's commitment made in open court on September 18, 2001 that it would not use those statements "on direct evidence in our case in chief."

2.  References to the testimony of these witnesses given on July 2, 2001 will be designated as PE Transcript.

3.  References to the testimony at this proceeding will be designated as SH Transcript.

the vehicle supplied by witnesses to the earlier drive–by shooting. (SH Transcript, p. 109). Both Gilbert and McCarthy were equipped with cell phones, and one of them called Detective Walsh at the C District police station to advise her of the location of the suspected vehicle. (SH Transcript p. 109). Detective Walsh was called because she was in charge of this shooting investigation.

At the time that Detective Walsh received the telephone call from Officers Gilbert and McCarthy on April 24, 2001, the defendant was present in the Station House and was being questioned by her partner, Detective Sanford. (SH Transcript, p. 8). After being notified by Gilbert and McCarthy as to finding the suspected vehicle at 68 Best Street, Detective Walsh questioned the defendant about the 68 Best Street location. Detective Sanford advised her that he knew that a police officer owned that building and that he would contact him for purposes of determining who the tenants in the building were. After contacting the owner of 68 Best Street, Detective Sanford advised Detective Walsh that the defendant was renting an apartment at 68 Best Street. The building at 68 Best Street, Buffalo, New York is a two-story, red brick building that contains two or more apartments. (*See* Government Exhibit E).

In the meantime, Officers Gilbert and McCarthy did a "security check" of the suspected vehicle parked in the driveway at 68 Best Street by opening the car doors which were unlocked since the windows of the vehicle were "tinted." This "security check" was done "to make sure there was nobody in the vehicle." After opening a car door, Officer McCarthy observed "spent shell casings in the vehicle." This occurred approximately forty-five minutes after the commission of the drive–by shooting. (PE Transcript, p. 6; SH Transcript, p. 36).

Officers Gilbert and McCarthy then proceeded to enter the building at 68 Best Street and attempted to make contact with anyone in the lower rear apartment of that building by knocking on the apartment door, but there was no answer to their knock. They then proceeded to the upstairs apartment and initiated contact with the resident of that apartment who advised them that the defendant, Douglas Williams, resided in the lower rear apartment. (SH Transcript, p. 109). The officers, with the permission of the upstairs tenant, did a "sweep" of this tenant's apartment to make sure that the defendant was not there. As a result of this "sweep," they determined that there were no other persons in that apartment. (SH Transcript, p. 111). Thereafter, Officers Gilbert and McCarthy once again attempted to make contact with anyone that might be in the lower rear apartment at 68 Best Street, now identified as the defendant's apartment, but such efforts were futile. As a result, they vacated the building and waited outside in the driveway of 68 Best Street and kept the building under surveillance to make sure that no one went in or out of the building. (SH Transcript, p. 110).

Approximately two and one-half to three hours after their initial arrival at 68 Best Street, Officers Gilbert and McCarthy observed a black female in her early twenties exit the side door of 68 Best Street. (SH Transcript, p. 110). She was only wearing a sweatshirt, sweatpants and slippers. The officers immediately approached her and spoke to her. She identified herself as Janet McCoy. When asked where she "stayed," she responded that she was "visiting a friend upstairs" and had arrived there "approximately an hour ago." However, because the officers had performed a "sweep" of the upstairs apartment and determined that only one person was present in that apartment, and since they had kept

the building under surveillance after conducting that "sweep," they knew that Ms. McCoy was not being truthful with them. (SH Transcript, p. 111).

The officers explained to Ms. McCoy why they were there, and upon doing so, Janet McCoy admitted that "she did stay in a lower apartment with Douglas Williams, who was her boyfriend. She said that she spent most of her time there, and the two of them split the rent together." (SH Transcript, p. 111). After indicating to Ms. McCoy that the police "were working on getting a search warrant, or a consent to search," (SH Transcript, p. 138), the officers asked Janet McCoy for her consent to search the lower rear apartment of 68 Best Street, that being the apartment that she said she shared with the defendant. They advised her that "there could be some firearms in the residence, and some evidence as well." (SH Transcript, p. 111). In response to this request, Janet McCoy, according to the uncontroverted testimony of Officer McCarthy, stated:

> All right, you guys can come in and search, if there is (sic) guns here, get them out.

SH Transcript, p. 112.

At the time that Ms. McCoy made the aforesaid statement, Officer McCarthy was in a position where he could see that the door to the lower rear apartment which had been closed when they had knocked on it in their two separate attempts, was now open. However, the officers did not attempt to enter the apartment at that time. Instead, they called Detective Walsh and advised her of the situation at 68 Best Street and the fact that they had obtained consent from Janet McCoy to search the apartment. In response, Detective Walsh advised Officer McCarthy that she "was

working on consent with Douglas Williams, and said, stay put." (SH Transcript, p. 112). It was approximately 1:35 p.m. on April 24, 2001 when Officers Gilbert and McCarthy advised Detective Walsh that Janet McCoy had consented to a search of the apartment.[4] (SH Transcript, p. 59). (*See* Government Exhibit 4). The officers remained outside of the building at 68 Best Street pursuant to Detective Walsh's directive.

The defendant had been placed under arrest at 12:10 p.m. on April 24, 2001 while at the C District Station House and was charged with attempted assault and reckless endangerment but was kept at the Station House for interrogation. (*See* Defendant's Exhibits B and D). The defendant had been at the Station House for at least two hours. (SH Transcript, p. 8). Once it had been determined that the defendant resided at 68 Best Street, Detective Walsh interrogated him about his occupancy at that address, and when he admitted that he resided there, she requested that the defendant sign a consent to search form for his apartment at 68 Best Street. (SH Transcript, p. 11; *see* Government Exhibit 1). Detective Walsh advised the defendant that the police wanted to search his apartment and that the form she was asking him to sign "was giving the police department, the officers, [herself] and the detectives permission to search." (SH Transcript, p. 13). The defendant read the form presented to him by Detective Walsh, and after doing so, signed it. Thereupon, Detective Walsh put the date April 24, 2001 and time of 2:25 p.m. on the consent form, that being the time it was signed by the defendant. (Government Exhibit 1) (SH Transcript, pp. 13–14, 15, 28).

---

4. There are a number of time references in this case on various exhibits which create an impression of police inconsistencies as to the time that events actually occurred. This issue of discrepancies will be discussed separately herein.

Detective Walsh then called Officers Gilbert and McCarthy and advised them that she had obtained a consent to search from the defendant and that she was now coming to 68 Best Street. (SH Transcript, pp. 15, 16). Since Officers Gilbert and McCarthy did not have consent forms with them, they asked Detective Walsh to bring a form with her which they would have Janet McCoy sign. (SH Transcript, p. 113).

Officers Gilbert and McCarthy waited outside of 68 Best Street with Janet McCoy for another fifteen or twenty minutes after being advised by Detective Walsh that the defendant had consented to a search of the apartment at 68 Best Street. (SH Transcript, p. 113).

However, because it was cold out and Janet McCoy was only wearing slippers and the aforesaid sweatshirt and sweatpants, and since she and the officers had been standing outside for some period of time, and since Detective Walsh had advised them that the defendant had consented to a search of the apartment at 68 Best Street, and Janet McCoy had also consented to a search of that apartment, Officers Gilbert and McCarthy decided that it was proper to enter the apartment since "it was just a matter of them coming over and signing a piece of paper." (SH Transcript, pp., 112, 113).

Almost immediately upon entering the apartment, Officer Gilbert discovered an "eight ball of crack cocaine" on top of a stereo speaker which was in the "first room that [he] entered when [he] came in." (PE Transcript, pp. 9, 29, 30). Thereupon, Ms. McCoy stated:

"I'm going to make this easier for you guys. I think you're going to want to take a look over here at this end of the couch."

PE Transcript pp. 9, 37.

According to Officer Gilbert, Ms. McCoy "motioned to the side and where the side and the back of the couch came together."

(PE Transcript, p. 9). Officer McCarthy then recovered the .380 caliber handgun which was "protruding from the side of the couch." (PE Transcript, p. 9). Shortly thereafter, Officer Gilbert discovered the .357 caliber revolver under a mattress which was in that same room where the couch was located. (PE Transcript, p. 10).

Shortly after the two aforesaid weapons and crack cocaine were found, Detective Walsh arrived at the apartment at 68 Best Street and had Janet McCoy sign the consent to search form, Government Exhibit 4. Detective Walsh placed the time of "13:35" and the date of April 24, 2001 on this consent to search form. Although McCoy signed the consent to search form sometime between 3:00 p.m. and 3:15 p.m. on April 24, 2001, the time of "13:35" was placed on the consent to search form by Detective Walsh to reflect the actual time that Janet McCoy gave oral consent to Officer Gilbert to search the apartment at 68 Best Street as reported by Officer Gilbert that such consent had been obtained. (SH Transcript, pp. 51, 58–59, 92, 94, 96–97) (PE Transcript, pp. 46–47). At "15:14 HRS" on April 24, 2001, Officer McCarthy took the written statement of Janet McCoy, Government Exhibit 5, which was completed at "15:42 HRS" wherein Ms. McCoy acknowledged that she had granted "verbal permission to search [her] residence located at 68 Best Street, lower rear, Buffalo, New York" and that "upon entry," she "inform[ed][the] officers that there was a handgun concealed in the arm of a couch." (SH Transcript, p. 115).

Shortly thereafter, the defendant was transported to the Buffalo Police Central Booking Station at 74 Franklin Street, Buffalo, New York and charged with various state criminal violations.

Officer McCarthy testified that no threats or promises were made to McCoy in order to obtain her oral consent to

search. He "indicated to Miss McCoy that she was not a target of the investigation, and that [they] were merely there to retrieve any evidence that was in the apartment." (SH Transcript, p. 116).

Detective Walsh testified that the defendant was not promised anything nor threatened in order to obtain his consent to search the apartment at 68 Best Street and that the defendant signed the consent to search form, Government Exhibit 1, without any hesitation. (SH Transcript, p. 16). This testimony and that of Officer McCarthy was not contradicted by the defendant.

## ISSUES

### I

DID THE WARRANTLESS SEARCH OF DEFENDANT'S APARTMENT AT 68 BEST STREET, BUFFALO, NEW YORK ON APRIL 24, 2001 AND THE SEIZURE OF THE TWO WEAPONS, THE CRACK COCAINE AND DOCUMENTS FROM THAT APARTMENT CONSTITUTE A VIOLATION OF DEFENDANT'S FOURTH AMENDMENT RIGHTS SO AS TO REQUIRE SUPPRESSION OF SUCH EVIDENCE SEIZED?

### II

DID THE WARRANTLESS SEARCH OF THE 1978 SUBURBAN TRUCK LOCATED IN THE DRIVEWAY AT 68 BEST STREET ON APRIL 24, 2001 AND THE SEIZURE OF THE SPENT SHELL CASINGS FROM THE TRUCK CONSTITUTE A VIOLATION OF DEFENDANT'S FOURTH AMENDMENT RIGHTS SO AS TO REQUIRE SUPPRESSION OF THAT EVIDENCE?

## RECOMMENDED CONCLUSION

### I

THE DEFENDANT'S FOURTH AMENDMENT RIGHTS WERE NOT VIOLATED IN THE SEARCH OF THE APARTMENT SINCE THE POLICE HAD OBTAINED A VALID CONSENT TO SEARCH THE APARTMENT WITHOUT A WARRANT PRIOR TO THE ACTUAL SEARCH AND SEIZURE AT ISSUE.

### II

A. THE DEFENDANT LACKS STANDING IN HIS MOTION TO SUPPRESS THE EVIDENCE SEIZED FROM THE 1978 SUBURBAN VEHICLE.

B. IN THE ALTERNATIVE, THERE WERE EXIGENT CIRCUMSTANCES WHICH PERMITTED THE OFFICERS TO CONDUCT A SEARCH OF THE VEHICLE WITHOUT A WARRANT.

C. SINCE THE OFFICERS HAD PROBABLE CAUSE TO STOP AND SEARCH THE VEHICLE, THEY HAD PROBABLE CAUSE TO SEARCH THE VEHICLE WITHOUT A WARRANT WHEN THEY FOUND IT AT 68 BEST STREET.

## DISCUSSION

It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is "*per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions." (citations omitted). It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable

cause is a search that is conducted pursuant to consent (citations omitted). *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

### Search of the Apartment

In support of its position that the search and seizure conducted in the apartment of the defendant at 68 Best Street, Buffalo, New York on April 24, 2001 was valid, the government relies on the claim that consent for such search of the apartment was given by the defendant and therefore a search warrant was not required.

However, the defendant claims that the search and seizure at issue occurred **before** his consent was obtained and therefore, it was illegal and in violation of his Fourth Amendment rights.

Although the government takes issue with this assertion, it relies on its fallback position that a valid consent to search the apartment had also been given by the defendant's girlfriend, Janet McCoy, who was also an occupant of the apartment and therefore, had authority to give such consent.

Since there are two consents involved, which occurred at different times periods by different parties, each consent will be addressed separately.

### The Consent Given By The Defendant

As previously stated, the defendant had been considered a suspect in a drive–by shooting and although not initially arrested, had been taken to the C District police station, along with other suspects and witnesses, for interrogation. However, as testified by Detective Walsh, the defendant was placed under arrest at 12:10 p.m. on April 24, 2001 and charged with the crime of attempted assault and criminal possession of a weapon. (*See* Defendant's Exhibit D) (SH Transcript, p. 8). Notwithstanding such arrest, the police continued to hold the defendant at the C Station and interrogate him for another two plus hours. At 2:25 p.m. on April 24, 2001, according to Detective Walsh, the defendant consented to a search of his apartment at 68 Best Street and signed a consent to search form. (Government Exhibit 1) (SH Transcript, pp. 11, 13).

> [W]hether a consent to search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all of the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine quo non* of an effective consent.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

The fact that he was in custody, *i.e.*, placed under arrest at the time that his consent was given, does not in and of itself vitiate the consent. As the United States Supreme Court has stated:

> [T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search.

*United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

Nevertheless, the Court of Appeals for the Second Circuit has stated that even though custody "alone is not enough to demonstrate involuntariness of consent," such claims of consent "should be scrutinized with care." *United States v. Vasquez–Santiago*, 602 F.2d 1069, 1073 (2d Cir.1979), *cert. denied* 447 U.S. 911, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980).

█ In the case at bar, the defendant has not really raised an issue of voluntariness as to the consent given by him, but rather, his claim of invalidity is based on the timing of the actual search and seizure and when his consent was obtained. He argues that the testimony of Detective Walsh and Government Exhibit 1 clearly

establish that his consent to search was given at 2:25 p.m. on April 24, 2001. The testimony of Officer McCarthy establishes that the actual search of the apartment and seizure of the weapons occurred before Detective Walsh arrived at 68 Best Street with the consent to search signed by the defendant. As a result, the defendant argues that the search and subsequent seizures are invalid.

The basic premise upon which the defendant bases his argument is faulty and ignores the facts established at the hearing. Detective Walsh testified that once she obtained the defendant's consent to search his apartment at 68 Best Street on April 24, 2001, she telephoned Officers McCarthy and Gilbert on their cell phone and advised them of that fact. (SH Transcript, pp. 15–16). Officers McCarthy and Gilbert received the phone call from Detective Walsh **prior** to entering the apartment at 68 Best Street while they were waiting outside of the building with Janet McCoy. Therefore, no search had been conducted before the defendant had given his consent. Admittedly, Officers McCarthy and Gilbert entered the apartment and began their search before Detective Walsh arrived at the scene with the written consent form signed by the defendant. However, that fact is of no legal consequence since Detective Walsh, the police officer in charge of the investigation, had the actual signed written consent in her possession and had advised the officers that such consent now existed before the officers entered the apartment and conducted the search.

Furthermore, as will be more fully discussed below, Officers McCarthy and Gilbert had previously received the consent of Janet McCoy, a co-occupant of the apartment, to enter the apartment and conduct a search. (SH Transcript, p. 112) (*see* Government Exhibits 4 and 5). Thus it can be said for the reasons hereinafter set forth, that the prior consent of Janet McCoy provided a valid entry to Officers Gilbert and McCarthy into the apartment and authorized them to conduct the search in question.

Since the defendant has not presented any evidence to cast doubt on the voluntariness of his consent, and since he has not denied that he gave consent to Detective Walsh as she testified (*see* Government Exhibit 1), I find that the defendant, Douglas Williams, voluntarily consented to a search of his apartment at 68 Best Street, Buffalo, New York on April 24, 2001 at 2:25 p.m. and that the seizures of the weapons, the crack cocaine and documents from said apartment were valid and not in violation of his Fourth Amendment rights. Therefore, it is RECOMMENDED that the defendant's motion to suppress this evidence on this basis be DENIED.

### The Consent Given By Janet McCoy

As a matter of judicial economy and efficiency, I have elected to address the issue of consent given by Janet McCoy for the search of defendant's apartment at 68 Best Street on April 24, 2001 in the event that it should be determined that the consent given by the defendant herein was invalid. The consent given by Janet McCoy is commonly referred to as "third-party consent."

[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.

*United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

This principle was reaffirmed by the United States Supreme Court in *Illinois v.*

*Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) wherein it stated:

> The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects (citations omitted). The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), or from a third party who possesses common authority over the premises, *see United States v. Matlock, supra,* at 171, 94 S.Ct. 988, 39 L.Ed.2d 242.

The Court went on to state:

> As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises? (citation omitted). If not, then warrantless entry without further inquiry is unlawful unless authority actually existed. But if so, the search is valid. *Id.* at 188, 189[, 110 S.Ct. 2793].

Previously, the United States Supreme Court addressed the issue of what constitutes "authority" to give consent as follows:

> The authority which justifies third-party consent ... rests ... on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Matlock, supra,* at 171, n. 7, 94 S.Ct. 988.

The Court of Appeals for the Second Circuit has addressed the issue of "authority" to give consent as follows:

> To satisfy the burden imposed on it by the third party consent principle, the government must show, by a preponderance of the evidence, that the consent to search was freely and voluntarily given, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and was obtained from someone "who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). Since third party consent does not involve the vicarious waiver of a defendant's constitutional rights, it validates a search only when a defendant can be said to have assumed the risk that someone having authority over the area to be searched would permit the governmental intrusion in his own right.

*United States v. Buettner–Janusch,* 646 F.2d 759, 764 (2d Cir.1981).

### A. Authority of Janet McCoy

Ms. McCoy told Officers Gilbert and McCarthy that she "stay[ed] in a lower apartment [at 68 Best Street] with Douglas Williams, who was her boyfriend." She further advised them that "she spent most of her time there and the two of them split the rent together." (SH Transcript pp. 111, 123, 136) (PE Transcript, p. 24). It was reasonable for the officers to accept and believe these statements by Ms. McCoy, especially since she had exited the apartment in question as determined by Officer McCarthy upon seeing the previously-locked apartment door open while they were interrogating Ms. McCoy outside of the building (SH Transcript pp. 112, 132); the fact that she was only wear-

ing slippers, sweatpants and a sweatshirt on a cold day (SH Transcript, p. 111), which he later described as being her "pajamas" (SH Transcript, pp. 124, 125) which he considered inappropriate dress for the weather (SH Transcript, p. 126); and she had advised them that she had not heard the officers knocking on the apartment door because "she was sleeping." (SH Transcript, p. 125). Nothing had been presented to the officers at this time to cause them to believe that Janet McCoy did not have authority to allow them to enter the apartment to conduct a search, nor was anything presented on behalf of the defendant at the suppression hearing to establish a lack of authority on her part to allow the officers to enter and search the apartment.

I therefore find that under the totality of the circumstances, the officers acted reasonably in believing that Janet McCoy had authority to allow them to enter and search the apartment and the resulting seizure of the weapons and other evidence was valid since she in fact had authority as a co-occupant to allow such search.

Even if it were assumed, *arguendo,* that Ms. McCoy did not have **actual** authority to consent to a search, the facts herein in their total context when objectively considered, created "apparent authority" in Ms. McCoy upon which the officers relied, which reliance I find to be reasonable. As a result, the search is valid on that basis as well. *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

**B. The Search Conducted Was Not Beyond The Scope of Janet McCoy's Authority**

When the officers entered the apartment, the first room they entered was a "common" room which Officer Gilbert described as being "set up as a living room" with a "large bed, a couch, a TV and a stereo system." (PE Transcript, p. 10).

As indicated earlier, almost immediately upon entering this room, Officer Gilbert found the "eight ball" of crack cocaine on the stereo speaker (PE Transcript, pp. 8, 9, 29, 30). As soon as the crack cocaine was discovered, Janet McCoy directed the officers' search to the couch, telling them that she was "going to make this easier for you guys." (PE Transcript, pp. 9, 29). Thereupon, the first gun, *i.e.,* the .380 caliber pistol, was found and seized. (PE Transcript, p. 9) (SH Transcript, p. 115). The second gun was shortly thereafter discovered under the mattress of the bed in this same "common" room. By directing the officers' search to the couch, Ms. McCoy demonstrated her knowledge, control and use of the room as a co-occupant of the apartment. This was not a situation where the officers forced their way into a locked room or a locked desk drawer or locked trunk or some other item of personality belonging exclusively to the defendant.

Once again, in considering the totality of the circumstances, with specific emphasis on the uncontradicted claim that Ms. McCoy "stayed at the apartment" and contributed to the rental payments for the apartment, it can reasonably be said that the defendant assumed the risk that she might consent to a search of the "common area" of the apartment. *United States v. Matlock,* 415 U.S. 164, 171, n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). As a result, the search of the "common room" and the seizure of the guns, the crack cocaine and the documents from that room were validly consented to by Ms. McCoy. The actions of Officers Gilbert and McCarthy on April 24, 2001 at 68 Best Street constituted a valid search and seizure of evidence from the apartment as to the defendant herein.

**C. The Consent of Janet McCoy was Voluntarily Given**

There is nothing in the record before this Court that would indicate, let alone

establish, that the consent given by Janet McCoy to search the apartment at 68 Best Street had not been voluntarily given. In fact, Government Exhibit 5 clearly establishes that Officers Gilbert and McCarthy informed her of the purpose of their visit to 68 Best Street and that she orally ("verbal") gave them her consent to conduct a search of the apartment. Therefore, I find that the oral consent to search given by Janet McCoy to the officers provided legal authority to them to search the apartment without a warrant. As a result, such search and ultimate seizures of evidence from the apartment are legal and not in violation of defendant's Fourth Amendment rights.

### The Alleged Time Discrepancies

■ During the course of the suppression hearing, defense counsel focused on what appeared to be time discrepancies as to when the defendant allegedly gave his consent to search, when the actual search began, and when the defendant was arrested. The basis for this attack was created by the various Buffalo Police Department documents generated in this case, *i.e.*, Defendant's Exhibit B, the state Felony Complaint, Defendant's Exhibit C, the state Arrest Booking form, Defendant's Exhibit D, another state Felony Complaint, Government Exhibit 4, the Permission to Search form signed by the defendant, and Government Exhibit 5, the signed statement of Janet McCoy. Each document will be addressed separately in the context of a "perceived discrepancy" relative to the issue of the timing of the actual search herein and when consents for such search were given.

### Defendant's Exhibit B—Felony Complaint

This complaint was signed by Detective Walsh, and it states:

[T]hat on or about 04/24/01 @ 9:58 a.m. and **12:10 P.M.** in the City of Buffalo, [the defendant] did intentionally, knowingly and unlawfully commit the felony of Attempted Assault, First Degree . . . (emphasis added).

The facts upon which this accusation is based are . . .: After def. gave permission to ofcs. to search his residence at 68 Best St., Det.G. McCarthy of CCTF did recover a Davis model P380, .380 auto pistol . . . which was found in the arm of the sofa.

### Defendant's Exhibit C—Arrest Booking Form

This form contains the following notations:

Arrest date—04/24/01; **Arrest Time— 12:10 HRS.** This def. did possess a .356 Magnum loaded and a .380 auto pistol, loaded (emphasis added).

### Defendant's Exhibit D—Felony Complaint

This complaint is also signed by Detective Walsh, and states:

[T]hat on or about 4/24/01 at **12:10 PM** in the City of Buffalo, [the defendant] did intentionally, knowingly and unlawfully commit the felony of CRIM.POSS. OF A WEAPON . . .

### Government Exhibit 1 Defendant's Permission to Search

This form clearly indicates that the defendant signed the Permission to Search form on April 24, 2001 at **2:25 p.m.**

### Government Exhibit 4—Janet McCoy's Permission to Search

This form would seem to indicate that Ms. McCoy signed the Permission to Search form on April 24, 2001 at **"1335 HRS."** or 1:35 p.m.

Counsel for the defendant argues that the search and seizure of the weapons occurred **BEFORE** consent for the search

of the apartment was given by either Janet McCoy or the defendant as evidenced by the time notations and descriptions contained in Defendant's Exhibits B, C and D. Each one of those exhibits, it is argued, indicates that the police had knowledge of defendant's possession of the weapons in question at "12:10 p.m." on April 24, 2001 and therefore, the search for those weapons at 68 Best Street had to occur at or before "12:10 p.m." on April 24, 2001. Since Janet McCoy did not give her consent to search until "1335 HRS" (1:35 p.m.) on April 24, 2001 (SH Transcript, p. 59), and since the defendant did not give his consent to search until "2:25 p.m." on April 24, 2001 (SH Transcript, pp. 13–14, 15, 28), the search of the apartment at 68 Best Street and the seizure of the weapons and other evidence from there were illegal since they were committed in violation of the defendant's Fourth Amendment rights under the United States Constitution. This argument is totally without merit and should be rejected for the reasons hereinafter stated.

Detective Walsh testified that the time of "12:10 p.m.," as appears on Defendant's Exhibits B, C and D, was used by the Buffalo Police Department Booking Technician based on the detective having first submitted a "P–163" Buffalo Police Department arrest data form. This arrest data form is given to the Booking Technician before a felony complaint is filled out, and it establishes the time that the defendant was placed under arrest by the charging officer. Although there were two separate charges, i.e., attempted assault (the drive–by shooting which occurred at "9:58 a.m." on April 24, 2001), and criminal possession of a controlled substance **after** 12:10 p.m.," there was only one arrest time used in the booking process, to wit, "12:10 p.m." (SH Transcript, pp. 48, 49, 50) (see Defendant's Exhibit B). The word "after" is emphasized since it clearly expresses the concept that this violation was deter-

mined after the defendant had been placed under arrest at "12:10 p.m." on April 24, 2001. This is consistent with the testimony of Detective Walsh and Officer McCarthy that the actual search of the apartment occurred after consent to search had been obtained from Janet McCoy at "1335 hrs." (1:35 p.m.) and the defendant at "2:25 p.m." on April 24, 2001. To read or interpret the statement contained in Defendant's Exhibit B as establishing that the search occurred at or before 12:10 p.m. on April 24, 2001 would be disingenuous to say the least.

The defendant basically makes the same argument with respect to the contents of Defendant's Exhibit D in that he is accused of possession of the weapons at "12:10 p.m." on April 24, 2001 and therefore, the search in question must have occurred at or before "12:10 p.m." on April 24, 2001 thereby making it invalid since it was conducted without a search warrant and before valid consents were given. This argument likewise lacks merit and should be rejected.

Once again, Detective Walsh testified that because there were different times for different events, i.e., 9:58 a.m. for the drive–by shooting and 12:10 p.m. for the arrest of the defendant, the Booking Technician used the arrest time on "each form for Mr. Williams and incorporated it into the form." (SH Transcript, p. 61).

Therefore, I find that the time of "12:10 p.m." on April 24, 2001 was utilized by the Buffalo Police Department Booking Technician as a universal point in time for purposes of filling out the various arrest and charging forms that had to be completed and signed by the arresting and/or charging officer as part of the established booking procedures. Although there is no dispute that "12:10 p.m." on April 24, 2001 was the time that the defendant was placed under arrest, it was not the time

that the search of the defendant's apartment at 68 Best Street had been commenced or completed. The uncontradicted testimony of Officer McCarthy clearly establishes that the search of the apartment and the ultimate seizure of the evidence at issue on April 24, 2001 did not take place until **after** Detective Walsh advised him that she had obtained a consent to search from the defendant. (SH Transcript, pp. 112, 113, 115, 116). The uncontradicted testimony of Detective Walsh clearly establishes that the consent to search defendant's apartment (Government Exhibit 1) was given at 2:25 p.m. on April 24, 2001. Admittedly, the actual search of the apartment commenced before Janet McCoy signed the consent to search form (Government Exhibit 4) but **after** she had given oral consent for such search and **after** Detective Walsh had advised that the defendant had signed a written consent to search form (Government Exhibit 1).

Therefore, I find that whatever ambiguities might exist as to the issue of time as set forth in Defendant's Exhibits B, C and D as aforesaid, are of no legal consequence on the issue of whether the search of the defendant's apartment at 68 Best Street on April 24, 2001 and the seizure of the weapons and other evidence resulting from such search were valid. For the reasons previously stated, such search and seizure was not in violation of defendant's Fourth Amendment rights and therefore, his motion to suppress the evidence on this basis should be DENIED.

### THE SEARCH OF THE VEHICLE

#### D. The Standing Issue:

■ In order to establish a violation of his Fourth Amendment rights, the defendant must meet a twofold requirement, "first that [he has] exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable'." *Katz v. United States*, 389 U.S.

347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■ The vehicle in question was parked, albeit in the driveway of 68 Best Street, in such a way as to be open to public view. There is no expectation of privacy in a driveway that is exposed to the public. *United States v. Hensel*, 699 F.2d 18 (1st Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 99 (1983).

The uncontradicted testimony of Officer Gilbert at the Preliminary Examination and Officer McCarthy at the suppression hearing clearly established that the 1978 Suburban vehicle was parked in the driveway at 68 Best Street and was visible from the public street. Further, the doors to this vehicle were unlocked and therefore, the interior of the vehicle was also accessible to any member of the public choosing to make such entry. (PE Transcript, pp. 6, 36; SH Transcript, p. 109).

As a result of the following testimony elicited by defense counsel in her cross-examination of Officer Gilbert at the Preliminary Examination, I have concluded that the 1978 Suburban vehicle at issue was not owned by the defendant:

Q. Okay. And you had testified on your direct testimony that somebody had identified the owner of that car as my client, Douglas Williams, right?

A. That's correct.

Q. Okay. And you're aware of the license plate on the car that you had just mentioned about the drive-by shooting, right?

A. Yes.

Q. You were able to obtain that?

A. Yes, ma'am.

Q. Did you ever run a motor vehicle search as to the owner of that car?

A. I don't believe I personally did, no.

Q. But you know that a motor vehicle search has been conducted, right?

A. That's correct.

Q. And that motor vehicle search does not trace back to Douglas Williams, does it?

A. Not that I'm aware of.

Q. And, in fact, it traces back to an individual named Bethany Miles, right?

A. I will take you at your word, yes.

Q. Does that name sound familiar?

A. No, it doesn't.

Q. You know for a fact it doesn't trace back to my client, does it?

A. No, it does not.

PE Transcript, pp. 18, 19.

There is nothing in the record that has been produced to date to establish that the defendant had any type of interest whatsoever in the 1978 Suburban vehicle parked in the driveway at 68 Best Street on April 24, 2001. As a result, I find that the defendant has failed to establish the necessary expectation of privacy in that vehicle and that by reason of that failure, he lacks standing to suppress the evidence seized from that vehicle on April 24, 2001. Therefore, it is RECOMMENDED that defendant's motion to suppress the evidence seized from the vehicle, *i.e.*, the spent shell casings, be DENIED.

### E. Exigent Circumstances:

■ As a matter of judicial economy and efficiency, I have chosen to further address the issue of the search of the 1978 Suburban vehicle in the event that this Court's finding that the defendant lacks standing to suppress the evidence seized from the vehicle is not accepted or upheld.

■ On April 24, 2001, Officers Gilbert and McCarthy were actively engaged in the investigation of the drive–by shooting that had occurred. They had been given a description of the vehicle involved in the shooting and had received information from a confidential informant as to where the vehicle in question might be located, thus the reason for their going to 68 Best Street. According to Officer Gilbert, they "spotted" the vehicle in question at 68 Best Street approximately 45 minutes after the drive–by shooting. (PE Transcript, p. 6) (SH Transcript, pp. 108, 109). Thereupon, the officers conducted a "security" search of the vehicle "to make sure that there was nobody in the vehicle." (PE Transcript, p. 6). Since the windows of the vehicle were "tinted," it was necessary for the officers to open the doors of the vehicle, which were not locked, in order to complete this "security" search. (PE Transcript, p. 36). Immediately upon opening the doors to the vehicle, the spent shell casings were "spotted" by Officer McCarthy. (PE Transcript, pp. 6, 36).

> The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others.

*Warden v. Hayden,* 387 U.S. 294, 298–299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

Since it had been reported that a drive–by shooting had occurred a short period of time before the officers came upon the 1978 Suburban vehicle, and that this particular vehicle matched the description of the vehicle involved in the drive–by shooting, it certainly was reasonable for the officers to be concerned not only with their own safety, but with that of members of the public as well, since it was possible that the perpetrators of the shooting might still be in the vehicle. Caution and sound police training dictated that this vehicle be examined by a "security" check since the officers had no way of knowing whether any of the perpetrators of the shooting were in the vehicle without actually examining the interior of the vehicle. In adopt-

ing the language of Court of Appeals for the District of Columbia in its decision in *Wayne v. United States,* 115 U.S.App.D.C. 234, 241, 318 F.2d 205, 212 (D.C.Cir.1963), the United States Supreme Court has stated:

> The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.

*Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

I find that the facts and circumstances, taken in their totality, that existed on April 24, 2001 at the time the officers discovered the 1978 Suburban at 68 Best Street constituted an exigency and/or emergency that justified their taking immediate action by conducting a "security" search of the vehicle so as to determine whether anyone, including the perpetrators of the shooting, were inside.

Once the car door was opened, the shell casings in question were immediately viewable to the police officers. (PE Transcript, p. 36).

> It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.

*Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

As a result, the seizure of the shell casings from the vehicle was legal and defendant's motion to suppress this evidence should be DENIED.

**F. Probable Cause:**

Even if it were argued that such facts and circumstances taken in their totality did not create an exigency and/or emergency justifying a warrantless search of the vehicle, I find that the search and seizure of the shell casings from the vehicle were valid for the following reasons.

Since Officers Gilbert and McCarthy had actually obtained a detailed description of the vehicle involved in the drive–by shooting on the morning of April 24, 2001 from witnesses at the scene of the shooting, and also had certain information obtained from a confidential informant (PE Transcript, pp. 6, 17, 18; SH Transcript, pp. 108, 109), they had probable cause to stop and search that vehicle to determine whether it contained weapons or ammunition or other evidence related to the shooting incident.

> In terms of the circumstances justifying a warrantless search, the Court has long distinguished between an automobile and a home or office .... after surveying the law from the time of the adoption of the Fourth Amendment onward, the Court held that automobiles and other conveyances may be searched without a warrant in circumstances that would not justify the search without a warrant of a house or an office, provided that there is probable cause to believe that the car contains articles that the officers are entitled to seize.

*Chambers v. Maroney,* 399 U.S. 42, 48, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

Admittedly, the officers remained at 68 Best Street for a number of hours and had the vehicle under observation and could have prevented its removal. It could be argued that during this time frame, a search warrant for the vehicle could have been sought. However, in order to prevent the removal of the vehicle from 68 Best Street prior to obtaining a search warrant, the officers would have had to seize it, and such seizure would likewise be a warrantless one. Such a possible scenario has been addressed by the United States Supreme Court wherein it stated:

> For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate

and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

*Chambers* at 52, 90 S.Ct. 1975.

Since I find that the officers would have had probable cause to stop the vehicle in question and conduct a search for the reasons previously stated, the actions of Officers Gilbert and McCarthy in immediately conducting a "security" search were reasonable under the Fourth Amendment and therefore, defendant's motion to suppress the evidence seized from the vehicle should be DENIED.

### CONCLUSION

Based on the foregoing, it is hereby RECOMMENDED that defendant's motion to suppress the weapons and other evidence seized from his apartment at 68 Best Street, Buffalo, New York and the shell casings seized from the 1978 Suburban vehicle parked in the driveway of 68 Best Street on April 24, 2001 be in all respects DENIED.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo,* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Paterson–Leitch Co., Inc. v. Mas-*

*sachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988). *Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek, et al. v. Canadair Ltd., et al.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Judge's refusal to consider the objection.*

The Clerk is directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

Dated: May 15, 2002.