JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant Raymond Beckwith (Beckwith) appeals from the decision of the Cuyahoga County Court of Common Pleas that denied his motion to suppress evidence. Finding no merit to this appeal, we affirm.
 {¶ 2} The record reflects that on April 18, 2006, appellant was indicted on one count of possession of drugs, to wit: crack cocaine, in violation of R.C. 2925.11, a felony of the fifth degree. On June 23, 2006, Beckwith filed a motion to suppress evidence (oral hearing requested). On October 30, 2006, a hearing was held on Beckwith's motion to suppress. After hearing the testimony of the State's two witnesses and one defense witness, the court found that the facts presented justified application of an exception to the Fourth Amendment requirement of a warrant prior to entering a private dwelling without consent. Beckwith's motion was denied by the trial court, and the case was set for trial.
 {¶ 3} The following facts give rise to this appeal.
 {¶ 4} In the early afternoon of March 1, 2006, Cleveland police officers Dona Feador (Feador) and Robert Beveridge (Beveridge) received a radio dispatch to respond to a loud music complaint at the location of 3466 West 58th Street, Cleveland, Ohio. When the officers arrived in their cruiser, they heard very loud music coming from the upstairs unit of an up-and-down, double house at that address, despite the fact that the windows were closed. *Page 4 
 {¶ 5} The officers went to the back door at 3466 West 58th Street and knocked repeatedly. At first they did not get a response as the music was very loud. Eventually, an individual, later identified as Beckwith, came down the steps and answered the door. The officers identified themselves as Cleveland police officers and asked him if he lived there. Officer Feador testified that Beckwith looked very shocked and that he jumped back "tore up the stairs" and screamed "[t]his is not my house." (Tr. at 9.) While in the stairwell, Beveridge yelled for Beckwith to stop, and he yelled again while in the house as Beckwith ran toward a bedroom. (Tr. at 35.)
 {¶ 6} Both officers testified that they were stunned by what they described as Beckwith's atypical and shocking response to a loud music complaint; and further testified that they chased after him because they didn't know if he was a burglar engaged in felonious criminal activity, or if there was some other explanation for his unusual behavior.
 {¶ 7} Officer Feador testified as follows:
 "Q And the Defendant said that he was going to get her; didn't he?
 A No, he did not.
 Q How did you know?
 A Because when he answered, the door, he took one look at us, jumped back and tore up the stairs screaming, `This is not my house.' I stood back like, wow." (Tr. 16.)
 Officer Feador also testified:
 "Q What was going through your mind when Mr. Beckwith was running up the steps? *Page 5 
 A Like I said, I was quite taken aback. I've never had a response from somebody like that, just us opening the door, him opening the door, and him just bolting. To me, that sends up warning signals.
 Q What kind of signals?
 A Is he a burglar? Is he going to get a gun? A lot of safety issues for my partner and myself.
 Q Did you suspect that he was in the process of the commission of a crime?
 A Absolutely.
 Q Did you think at that point in time, it may be a felony?
 A Absolutely." (Tr. 21.)
 Her partner, Officer Beveridge testified as follows:
 "Q What did Mr. Beckwith do when he answered the door?
 A He opened the door, got kind of a scared look. I asked if he lived there, gentleman said no, and just then whipped around, took off running up the stairs.
 Q Did he say anything else to you at that time?
 A He was screaming as he was running up the stairs, "I don't live here" the whole time he was running up the stairs.
 Q At any time did he tell you who did live there?
 A No.
 Q Did he tell you that he was going to get the person that lived there?
 A No. *Page 6 
 Q What was going through your mind as this individual is fleeing from you up the stairs?
 A A lot of bad thoughts. I wasn't sure what was going on. Was he breaking in? Did he have someone kidnapped up there? Was he going to get a weapon? We didn't know.
 Q Did you think it was possible that he was in the course of committing a felony at that particular time?
 A Most definitely.
 Q Did you pursue him up the stairs?
 A Yes, I did.
 Q What happened when you got to the top of the stairs?
 A As I said, we were chasing him up the stairs. He kept screaming he didn't live there. As he hit the door that led to the upstairs apartment, he tried to slam it on me. I got my foot and hand in the way, stopped it, it kind of bounced back up; watched the gentleman run through the kitchen. He kept running through the apartment; I kept running behind him." (Tr. 26-27.)
 {¶ 8} The officers were concerned that the situation presented safety issues to themselves or possibly others. They did not have an opportunity to inform Beckwith why they were there. As they arrived at the doorway leading to the upstairs apartment, Beckwith "flew in the doorway." (Tr. 10.) Officers Beveridge and Feador were right behind him. Beckwith attempted to slam the door shut on Beveridge; however, Beveridge stuck his hand and foot between the door and the door swung open. As the officers entered the apartment, they again identified *Page 7 
themselves as Cleveland police officers. Loud music continued to blare from the apartment.
 {¶ 9} Beckwith was still in flight through the kitchen and then the living room when Beveridge observed him run past a seated female. Beckwith reached and grabbed something from where her hand was located and "took off running" into a bedroom. (Tr. 27.) Officer Beveridge pursued Beckwith into a bedroom of the apartment, where he observed him throw something he had in his hand, which was later identified to be a bag of marijuana. In the meantime, Feador, who had followed her partner into the kitchen and living room area, remained in the living room with whom she observed to be a pregnant female. She instructed the female to remain seated. While in the living room, Feador observed a scale and a plate containing what appeared to be cocaine on a table.
 {¶ 10} After Beckwith was quickly arrested and Mirandized, the officers determined that the apartment was leased by Beckwith's pregnant girlfriend. Beckwith gave his address as 9600 Fuller Avenue, Cleveland, Ohio; however, his girlfriend testified that he had actually lived with her on West 58th Street for six months. (Tr. 41-42.)
 {¶ 11} Beckwith's girlfriend testified that when he came back into the unit from the stairwell, he told her to go downstairs as the police were at the door. She testified that there were no officers behind him and that before she could get to her kitchen door the police were already in the unit. She testified that she did not give *Page 8 
them permission to come into the unit, and that they were already in when she saw them.
 {¶ 12} Beckwith admitted that the cocaine, scale, and the marijuana were all his, and he was indicted for possession of cocaine. His girlfriend was issued a citation for a loud noise violation, a minor misdemeanor.
 {¶ 13} The trial court determined that Beckwith did have standing to challenge the entrance and search of 3466 W. 58th Street, as he lived there with his girlfriend. (Tr. at 58-59.)[1]
 {¶ 14} The trial court additionally found the warrantless search to be reasonable, given Beckwith's bizarre behavior. It determined that given the totality of the circumstances the officers had reasonable, articulable suspicion that under the circumstances a crime was being committed and their own safety and that of others were at issue, which gave them probable cause to enter the residence without a warrant. (Tr. at 59-61.)
 {¶ 15} Beckwith contends that the entry of the police into the upstairs unit at 3466 W. 58th Street was without consent of the household members and without any justification. However, the State contends that despite the lack of consent, the entry *Page 9 
was warranted because the loud noise complaint, coupled with Beckwith's alarming behavior, presented exigent circumstances justifying a warrantless entry.
 {¶ 16} The standard of review regarding motions to suppress is set forth by the Ohio Supreme Court as follows:
 "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence.
 Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." State v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372. (Internal citations omitted.)
 {¶ 17} As recently noted by this court in State v. Golly, Cuyahoga App. No. 89481, 2008-Ohio-447, at T|13, "[warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject to only a few well-recognized exceptions." See, also, Katz v. UnitedStates (1967), 389 U.S. 347, 88 S.Ct. 507.
 {¶ 18} As stated in State v. Akron Airport Post 8975 (1985),19 Ohio St.3d 49, at syllabus: "where there is no search warrant, the burden falls on the state to show that a search comes within one of the judicially recognized exceptions: (a) a search incident to a lawful arrest; (b) consent signifying waiver of constitutional rights; (c) the stop-and-frisk doctrine; (d) hot pursuit; (e) probable cause to search, and the presence of exigent circumstances; or (f) the plain-view doctrine. *Page 10 
 {¶ 19} The state relies on the "exigent circumstances" exception to the Fourth Amendment warrant requirement. As held in State v.Applegate (1994), 68 Ohio St.3d 348, 1994-Ohio-356:
 "A warrantless police entry into a private residence is not unlawful if made upon exigent circumstances, a `specifically established and well-delineated exceptio[n]' to the search warrant requirement.' Katz v. United States
(1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585. `The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' Mincey v. Arizona (1978), 437 U.S. 385, 392-393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290, 300, quoting Wayne v. United States (C.A.D.C. 1963), 318 F.2d 205, 212, certiorari denied (1963), 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86. In Wayne, then-federal Court of Appeals Judge Warren Burger explained the reasoning behind the exigent circumstances exception:
 [T]he business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation of the judicial process." Wayne at 212.
 {¶ 20} We find in the case sub judice as we did in State v.Jackson, Cuyahoga App. No. 83420, 2004-Ohio-4467, that the particular, unique facts and circumstances of the situation presented to the officers was a "reasonably perceived `emergency' requiring immediate entry due to the protective functions of the police as opposed to, or in addition to, their law enforcement functions." Id. at ¶ 20.
 {¶ 21} The court in State v. Wilson, Clinton App. No. 2006-03-008,2007-Ohio-353, recognized the type of circumstances justifying a need for warrantless entry when police officers reasonably believe that immediate action is necessary to either protect property or to assist individuals in danger or in need of aid. *Page 11 
 "Some courts have recognized that a warrantless entry into a home by law enforcement is permissible to protect the property of the owner or occupant, such as when the police reasonably believe that the premises has been or is being burglarized. United States v. Estese (C.A.6, 1973), 479 F.2d 1273; United States v. Johnson (C.A.6, 1993), 9 F.3d 506, 510 (officers responded to report of a possible burglary in progress, and upon arrival discovered a broken window and two individuals inside); State v. Durbin (July 11, 1988), Butler App. No. CA87-12-167, 1988 Ohio App. LEXIS 2746; State v. Sladeck (1998), 132 Ohio App.3d 86, 88-89, 724 N.E.2d 488; State v. Mathis, Summit App. Nos. Civ.A. 22039, Civ.A. 22040, 2004 Ohio 6749, P36, appeal not allowed, 105 Ohio St. 3d 1519, 2005 Ohio 1880, 826 N.E.2d 316, certiorari denied, 546 U.S. 876, 126 S. Ct. 388, 163 L. Ed. 2d 172, appeal not allowed, 109 Ohio St. 3d 1458, 2006 Ohio 2226, 847 N.E.2d 7 (since officer reasonably believed burglary was in progress, exigent circumstances existed to justify his entry and a protective sweep of home); State v. Newell, Montgomery App. No. 21567, 2006 Ohio 5980, P11 (police may make a warrantless entry into a private home when they reasonably believe that immediate action is necessary to either protect that property or assist persons inside who may be in danger or in need of immediate aid; police may also enter to check for any victims or suspects that may be inside the premises).
 {¶ 22} In the case sub judice, Beckwith's own alarming behavior properly solidified the officers concern that they had to enter the premises to address exigent circumstances, the exact nature of which they were not sure. As held in State v. Upton, Hamilton App. No. C-050076, 2006-Ohio-1107, exigent circumstances includes the risk of undetected escape by a suspect within a residence and a threat of harm posed by the suspect to either himself, the public or police.
 {¶ 23} The two Cleveland police officers were presented with an alarming situation involving a frantic individual. Beckwith protested any ability on his part to effect the noise situation, and entered the premises from which the loud noise was *Page 12 
emanating, possibly without authorization and possibly with the purpose to commit an offense involving possible harm to the officers or citizenry. He did not indicate that he would turn down the music player or tell anyone else at the premises to do so. He did not tell the police he would get the owner to come to the door. Furthermore, his unusual response as he "tore up the stairs" screaming that he didn't live there, posed a grave concern to the officers that he presented a risk of danger to the police or others.
 {¶ 24} Given these circumstances, we find nothing in the Fourth Amendment that requires the police to obtain a search warrant where the police were presented with a bizarre situation presenting exigent circumstances. The Cleveland police officers' warrantless entry into the unit that Beckwith lived for six months was justified by an exigent circumstance exception. Therefore, we overrule the sole assignment of error.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 13 
Anthony O. Calabrese, Jr., P.J., and Melody J. Stewart, J., Concur
[1] Beckwith first said he did not live there, and then after he was arrested gave 9600 Fuller Avenue, Cleveland, Ohio as his address. However, the trial court found that Beckwith did live at West 58th Street, based on his girlfriend's testimony. The trial court determined that Beckwith had standing based on this information and denied his motion to suppress. *Page 1