O’BRIEN, J.,
concurring.
I agree with the result reached by the majority and do not quarrel with its resolution of the arguments presented.[1] My point of departure is with the acceptance of McHugh’s argument that a “reasonable suspicion of criminal activity” is a necessary requirement in this case. Defining the issue is the first step of the analysis; that issue is public safety, not criminal investigation. The officer’s ultimate goal may have been to investigate possible criminal behavior, but upon arriving at the scene that ultimate goal was at least temporarily eclipsed by a more pressing and immediate need (and the matter at issue here) — to insure public safety. The exquisitely narrow issue is whether Officer Oakes could, without violating the Fourth Amendment, require McHugh to get out of his vehicle whether or not there was a reasonable and articulable suspicion that McHugh or his companion had committed or were about to commit a crime. The broader principles of Terry guide our decision; we “first ... focus upon the governmental interest which allegedly justifies official intrusion” and next consider whether the “articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.” Terry v. Ohio, 392 U.S. 1, 20-21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In applying those principles, we must recognize the multiple roles assigned to law enforcement officers.
By design or default, the police are also expected to reduce the opportunities for *1260 the commission of some crimes through preventative patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conñict, create and maintain a feeling of security in the community, and provide other services on an emergency basis.
3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.6 (4th ed.) (emphasis added). The public safety exception to the search warrant requirement found its genesis in Wayne v. United States, where then Judge Burger wrote:
“[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.”
318 F.2d 205, 212 (D.C.Cir.1963) (emphasis added). “[T]he business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct.” Id. This principle was reflected in Mincey v. Arizona, another search case. 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). And again in Brigham City, Utah v. Stuart, where it was said, “Nothing in the Fourth Amendment required [officers] to wait until another blow rendered someone ‘unconscious’ or ‘semi-conscious’ or worse before entering. The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; ...” 547 U.S. 398, 406, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (Warrantless police entry into a home to stop a fight). And yet again in Michigan v. Fisher, where the Court wrote: “Officers do not need ironclad proof of ‘a likely serious, life-threatening’ injury to invoke the emergency aid exception.” - U.S. -, 130 S.Ct. 546, 549, 175 L.Ed.2d 410 (2009) (Warrantless police entry into a home prompted by demonstrated violence against property and potential risk to persons). The Court there explained: “It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here. Only when an apparent threat has become an actual harm can officers rule out innocuous explanations for ominous circumstances.” Id. It does not serve us well to restrict these guiding principles to searches; the compelling reasons for immediate police action do not lose their force simply because a person is temporarily seized (rather than searched) in order to bring a dangerous circumstance under control pending a dispassionate investigation. Indeed, both Brigham City and Fisher involved not merely warrantless entries into a home, but also seizures of individuals within the home.
The Supreme Court has repeatedly said, “the ultimate touchstone of the Fourth Amendment is ‘reasonableness.’ ” Brigham City, 547 U.S. at 403, 126 S.Ct. 1943. (citations omitted). “An action is ‘reasonable’ under the Fourth Amendment, regardless of the individual officer’s state of mind, as long as the circumstances, viewed objectively, justify the action.” Id. at 404, 126 S.Ct. 1943 (quotations omitted). Reasonableness is, of course, highly fact sensitive. “[W]e have treated reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones.” United States v. Banks, 540 U.S. 31, 36, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003)
*1261 With reasonableness as the guide, I now briefly turn to the undisputed facts of this case. The two officers, Oakes and Brisbin, were dispatched to a parking lot at 2 a.m. On the way, they learned (from dispatch) that an armed security guard was holding two men at gun point and the guard reported the men may be armed. [Vol. 3 at 30] When the officers arrived, they saw the guard “behind [McHugh’s] car with his lights on it and pointing his gun at the car and two subjects in the car.” (R. Vol. 3 at 31.) The guard told the officers he had sprayed the men with pepper spray and described their behavior as “hinky.”[2] (Vol. 3 at 31.) Oakes went to [McHugh’s] door and instructed him to get out of the car. “As [McHugh] stepped out of the car he advised [Oakes] that he had a gun.” (Id. at 32.) As a result, Oakes “brought him back to the back of the ear, placed him on his knees, handcuffed him and then started patting him down.” (Id.)
The steps taken by these officers to diffuse a potentially deadly situation were reasonable, even assuming their actions amounted to a seizure.[3] When they reached the car, the security guard put away his weapon — an action that reduced, but did not eliminate, the potential for violence. The officers reasonably believed McHugh may have a weapon, but even if they had no such belief, ordering him to exit the car was a matter of common sense and done, according to Oakes, for safety reasons.[4] McHugh had been pepper-sprayed by the guard and was likely out of sorts. More important, a vehicle was involved (even though the stop was not instigated by the officers), presenting all of the dangers courts have repeatedly appreciated in such circumstances.[5] Reasonable suspicion of criminal activity was not necessary. See Pennsylvania v. Mimms, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (Ordering a driver and passenger out of a vehicle for officer safety following a traffic stop is justified — “We think it too plain for argument that the State’s proffered justification — the safety of the officer — is both legitimate and weighty. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.”) (quotations omitted). Given the officers’ valid presence at the scene, the Supreme Court has stressed “[t]he risk of harm to both the police and the occupants of a stopped vehicle is minimized, ... if the officers routinely exercise unquestioned command of the situation.” Arizona v. Johnson, 555 U.S. 323, 129 S.Ct. 781, 786, 172 L.Ed.2d 694 (2009) (quotations omitted) (Passenger removed from the back seat of a vehicle stopped for a traffic violation and frisked. The frisk was based upon suspicion of *1262 gang membership, a scanner in his pocket and his admitted criminal past).
Removing McHugh from the car was an appropriate response, not just for officer safety but for that of all the participants, one reasonably calculated to quickly deescalate and control a dangerous situation. McHugh’s volunteered statement that he had a gun, fully justified his immediate physical seizure, handcuffing and searching. It “permitted the officer to conclude that [he] was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of ‘reasonable caution’ would likely have conducted the ‘pat down.’ ” Mimms, 434 U.S. at 112, 98 S.Ct. 330.
The circumstances of this case render any inquiry into the officers’ reasonable suspicion of criminal activity by the defendant or his partner an irrelevant distraction. The question is whether “the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the action taken was appropriate.” Id. (quotations omitted). To my lights, they did; the officers conducted themselves reasonably throughout the incident. The Fourth Amendment requires nothing more.

. This is one of those instances where we ought not to engage the issue as the parties have framed it because they have obscured, rather than observed, guiding precedent. We can, and should in this case, affirm on the different grounds I outline; grounds fully supported by the record. See Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1130 (10th Cir. 2011) ("We have long said that we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal.”).

. The professional competence of the security guard is surely debatable, but not particularly relevant. We focus solely on the actions of the officers, but with due regard to the totality of the circumstances. The security guard’s acts and statements possibly add context, but little more. In the same vein, whether or riot the police had reason to believe the defendant was armed may be significant, but not determinative. Given the situation they encountered, their acts were reasonable even if they did not suspect the defendant or his companion was armed.

. The officers made neither a traffic stop nor a Terry stop. Any seizure first occurred when McHugh was asked to exit his vehicle, a precaution sanctioned by Pennsylvania v. Mimms, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

. The second officer, Brisbin, was closely watching McHugh’s passenger.

. Since it did not involve the officers, the legitimacy of the stop is not an issue. Nothing suggests the security guard was acting in concert with the officers or even that they had acquiesced in his conduct. Any suggestion that the officer's attempt to bring a tense situation under control might be construed as a "stop” strains credulity.